**FIRST NATIONAL BANK OF COUNCIL BLUFFS, IOWA, Petitioner,**

v.

**OFFICE OF the COMPTROLLER OF the CURRENCY, Respondent.**

No. 91–2289.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1991.

Decided Feb. 19, 1992.

---

James B. Cavanaugh, Omaha, Neb., argued, for petitioner.

Yvonne D. McIntire, Washington, D.C., argued (L. Robert Griffin, on brief), for respondent.

Before JOHN R. GIBSON, Circuit Judge, FRIEDMAN *, Senior Circuit Judge, and MAGILL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This petition to review challenges the decision of the Comptroller of the Currency

---

\* Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

(Comptroller) (1) that the petitioner, First National Bank of Council Bluffs (Bank), violated the Truth in Lending Act (Act or TILA), 15 U.S.C. § 1601 *et seq.* (1988 & Supp. I 1989), and the implementing Regulation Z of the Federal Reserve Board (Board or FRB), 12 C.F.R. Part 226 (1987), by failure to disclose certain information to borrowers and (2) requiring the Bank to make restitution to its borrowers for those violations. We uphold the Comptroller's determination of violation, vacate in part and reverse in part the relief he ordered, and remand the case to the Comptroller for further proceedings.

## I

A. The facts were stipulated.

1. In 1986, the Bank began offering discounted variable interest rate consumer installment loans. Those were loans for which the initial rate for the first year was below the market rate and the rate for the remainder of the loan was at the going rate, which varied from time to time. Between June 1986 and June 1988, the Bank made 691 such loans, on which the discounted "teaser" rate for the first year ranged from 7.9 to 9.9 percent, which was below the Bank's regular consumer loan rates.

The Act requires a financial institution to disclose to borrowers the "annual percentage rate" (APR). 15 U.S.C. § 1638(a)(4). Regulation Z, which the Board promulgated pursuant to its statutory authority to issue regulations under the Act specifying how the annual percentage rate is to be determined, 15 U.S.C. § 1606(a), states that for variable interest rate loans, the financial institution must disclose: "(i) The circumstances under which the rate may increase. (ii) Any limitations on the increase. (iii) The effect of an increase. (iv) An example of the payment terms that would result from an increase." 12 C.F.R. § 226.-18(f).

The Board publishes an official staff commentary, commonly known as the "Commentary," which explains and interprets the Act and Regulation Z. *See* 12 C.F.R. Part 226, Supp. I, Introduction. The Commentary states that in making discounted variable interest rate consumer loans, the disclosure "should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation." *Id.* at Comment 18–f, ¶ 8. In other words, for those loans, the proper disclosure was not the discounted rate for the first year, but a composite rate that reflected both the discounted rate and the normally higher rate that the lender charged for such loans at the time the loan was made, calculated for the balance of the loan term after the period for which the discounted rate applied.

On the 691 discounted variable interest loans the Bank made between June 1986 and June 1988, the Bank disclosed the discounted rate for the first year and the four items of information listed above that Regulation Z prescribed. The Bank did not disclose, however, the composite rate that the Commentary required. According to the Bank, it did not disclose the latter item because its officials in charge of these loans had not seen the Commentary and were unaware of its requirements. During the same period, however, the Bank did disclose the composite rate on certain real estate loans, which were handled by a different department.

2. The Act also requires lenders to disclose the "finance charge" on the loan. 15 U.S.C. § 1638(a)(3). Between March 26th and November 6, 1987, the Bank made fifteen real estate loans on which it required the borrower to purchase private mortgage insurance. The parties stipulated that the premiums for such insurance constituted a part of the total "finance charge." In thirteen of the fifteen real estate loans, the finance charge the Bank disclosed did not reflect the cost of the private mortgage insurance.

The Bank stated that the failure to disclose resulted from the inadvertent error of a clerk, who apparently did not know that the cost of private mortgage insurance was required to be included as a part of the finance charge. The Bank itself discovered

the nondisclosure and provided the 15 borrowers with correct disclosure of the finance charge. All but two of them signed and returned to the Bank their acceptance of this disclosure.

B. The Act gives various government regulatory agencies enforcement authority over different types of financial institutions. 15 U.S.C. § 1607. The Comptroller has that authority with respect to national banks, *id.* at § 1607(a)(1)(A), of which the Bank is one. The Act provides that the enforcing agency "in cases where an annual percentage rate or finance charge was inaccurately disclosed, shall notify the creditor of such disclosure error and is authorized in accordance with the provisions of this subsection to require the creditor to make an adjustment to the account of the person to whom credit was extended, to assure that such person will not be required to pay a finance charge in excess of the finance charge actually disclosed or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower." *Id.* at § 1607(e)(1).

After the Comptroller's staff conducted a consumer compliance examination of the Bank, i.e., one to determine the Bank's compliance with the Act and Regulation Z, and determined that the bank had violated the Act and Regulation Z by the foregoing nondisclosures, the staff requested the Bank to take action to correct the violations. When the Bank refused to do so, the Comptroller issued a notice of charges against the Bank, pursuant to 12 U.S.C. § 1818(b) (1988). Following full administrative proceedings, which included an evidentiary hearing, a decision by an administrative law judge and appeals to the Comptroller, the latter held that the Bank had violated the Act and Regulation Z by failing (1) to disclose the composite interest rate on the discounted variable interest loans and (2) to include the cost of private mortgage insurance in the finance charge.

In holding that failure to disclose the composite rate violated the Act and Regulation Z as interpreted in the Commentary, the Comptroller pointed out that "[r]equiring disclosure of a composite APR accomplishes TILA's goal of 'assur[ing] meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit....' 15 U.S.C. § 1601(a). As is evident from the loan documentation in the record, disclosing only the discounted, 'teaser' rate as the APR does not give a consumer an accurate idea of the true cost of credit over time, because the APR, finance charge and total of payments are understated." He stated that in *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the Supreme Court "held that deference to the FRB staff opinions 'is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions should be dispositive....' *Milhollin* at 565 [100 S.Ct. at 797]." He concluded that "[s]ince the Commentary's provision on composite APR's is not irrational and appears to reflect the policies underlying TILA, the Comptroller will defer to it here."

The Comptroller rejected the Bank's argument that its officials' unfamiliarity with the Commentary provision involved was a defense, since "ignorance is not a defense under TILA." He also held that the Bank's noncompliance "resulted from ... a clear and consistent pattern or practice of violations" under the Act. 15 U.S.C. § 1607(e)(2).

With respect to the Bank's failure to include the cost of private mortgage insurance in the finance charge, the Comptroller stated that in view of the Bank's stipulation that "inaccurate disclosures were made on 13 loans for which [private mortgage insurance] was required, there is no genuine issue about the existence of a violation." He ruled that the nondisclosure "resulted from ... a clear and consistent pattern or practice of violations," because "13 of 15, or 87 percent, of the real estate loans within a six-month period constitutes a pattern or practice. During this period, incorrect calculations were the norm, not the exception."

Finally, the Comptroller held that the Bank was required to (1) reimburse each of the borrowers to whom proper disclosure had not been made to reflect the difference between the discounted disclosed rate and the composite rate that should have been disclosed, and (2) either pay the remaining balance or cancel the private mortgage insurance premiums for accounts in which the Bank had failed to disclose accurately the finance charge. He ruled that under the Act, the period for which reimbursement should be made was from January 31, 1985, the date of the last previously-conducted consumer compliance examination, to June 30, 1988. He rejected the Administrative Law Judge's conclusion that the period of reimbursement ran only from December 31, 1987, the date of the last preceding bank examination which, however, did not examine the Bank's compliance with the Act and Regulation Z.

The Comptroller issued a detailed cease and desist order reflecting his rulings.

## II.

■ The Bank argues that its duty to disclose is defined in the Act and Regulation Z, that it complied with those requirements, and that its failure to disclose the composite rate on its discounted variable interest rate loans, as the Commentary required, did not violate the Act or Regulation Z. Our recent decision in *Sentinel Fed. Sav. and Loan Ass'n. v. Office of Thrift Supervision*, 946 F.2d 85 (8th Cir. 1991) forecloses the contention. That case involved the Office of Thrift Supervision, which has the supervisory role in determining and insuring compliance by savings and loan companies with the Act.

We stated there that the "primary issue on this appeal" was whether Sentinel "violated the Truth in Lending Act ... by making discounted variable rate loans without disclosing a 'composite annual percentage rate' as required by a Federal Reserve Board (FRB) Official Staff commentary." 946 F.2d at 86. The court upheld the Office of Thrift Supervision's determination that Sentinel violated the Act by such nondisclosure, and rejected Sentinel's contention that it "made all the disclosures expressly required by the statute and Regulation Z." *Id.*

Sentinel contended that "it cannot be required to make this composite annual percentage rate disclosure because the Commentary expands and changes the specific annual percentage rate disclosures prescribed in the statute and Regulation Z." 946 F.2d at 89. In rejecting the contention, the court pointed out that

the Supreme Court has recognized that the complexity and variety of consumer credit transactions make it impractical for FRB to deal explicitly with every credit disclosure issue by regulation. Therefore, absent a clear expression in the statute or regulations, "it is appropriate to defer to the [FRB] and staff in determining what resolution of [a disclosure] issue is implied by the truth-in-lending enactments." [*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555] at 560 [, 100 S.Ct. at 794]. "*Unless demonstrably irrational*, [FRB] staff opinions construing the Act or Regulation [Z] should be dispositive ...," *Id.* at 565 [, 100 S.Ct. at 797] (emphasis added). *See also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 [, 101 S.Ct. 2266, 2273–74, 68 L.Ed.2d 783] (1981) ("[A]bsent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation.").

These Supreme Court cases make it abundantly clear that Sentinel's attack on the validity of the Official Staff Commentary must fail unless Sentinel can show that the composite annual percentage rate disclosure requirement was "demonstrably irrational." *See Hardison v. General Fin. Corp.*, 738 F.2d 893, 896 (7th Cir.1984).

946 F.2d at 89.

The Court ruled that although "the Commentary's composite rate is based upon an assumption of what future interest rates will be under the index formula," the question was whether that rate

is nonetheless a "meaningful disclosure of credit terms" consistent with the purpose of TILA. This case demonstrates the virtue of the Commentary's methodology. Sentinel disclosed only the artificially low teaser rate as the annual percentage rate for the loan, whereas under the Commentary it would have disclosed a higher annual percentage rate based upon an estimate of the inevitable future rate increases under the index formula. Clearly, the Commentary's calculation, though imprecise, is more accurate over the life of the loan than the rate disclosed by Sentinel. Thus, the Commentary's requirement is consistent with the statute's purposes and can hardly be deemed "demonstrably irrational."

*Id.*

The court concluded that the Commentary "is a rational, permissible interpretation of the statute and Regulation Z." *Id.*

This analysis and conclusion is equally applicable to the present case and requires affirmance of the Comptroller's determination that the Bank's failure to disclose the composite rate in accordance with the Commentary was a violation of the Act and Regulation Z. Here, as in *Sentinel,* the Bank's disclosure of "only the artificially low teaser rate as the annual percentage rate for the loan," *id.,* defeated " '[t]he fundamental purpose of [the Act] ... to require creditors to disclose the 'true' cost of consumer credit, so that consumers can make informed choices among available methods of payment.' *Joseph v. Norman's Health Club, Inc.,* 532 F.2d 86, 90 (8th Cir.1976)." The Comptroller was fully justified in holding that the Commentary properly defined the Bank's duty of disclosure under the Act.

■ The Bank contends that because the Commentary's provision governing disclosure of discounted variable rate consumer loans states that the disclosure "should" reflect the composite rate rather than "shall" or "must" do so, the lender has discretion in how to comply with the Commentary. We agree with and adopt the Comptroller's reasoning in rejecting this contention:

The word "should" has been defined as "ordinarily implying duty or obligation...." Black's Law Dictionary 1379 (6th ed. 1990). Moreover, the Commentary to 12 C.F.R. § 226.18(f) shows that the FRB used "must" and "should" interchangeably. For example, after stating that "the disclosures should reflect a composite annual percentage rate", the Commentary asserts that "[t]he effect of the multiple rates must also be reflected in the calculation and disclosure of the finance charge, total of payments, and payment schedule." 12 C.F.R. Part 226, Supp. I, Comment 18–f, ¶ 8 (emphasis added). Thus, a fair reading of the Commentary is that the FRB intended the disclosure of a composite APR to be mandatory.

■ B. The Act directs the enforcing agency to require reimbursement of debtors for disclosure errors where the agency "determines that such disclosure error resulted from (A) a clear and consistent pattern or practice of violations, (B) gross negligence, or (C) a willful violation which was intended to mislead the person to whom the credit was extended." 15 U.S.C. § 1607(e)(2). Since the parties stipulated that the Bank's nondisclosure of the composite rate did not result from either gross negligence or a willful violation of the Act intended to deceive the borrowers, the question is whether it resulted from "a clear and consistent pattern or practice of violations."

The Comptroller found that the Bank's nondisclosure did result from such a pattern or practice. He noted the large number of violations—"the Bank compounded its error some 691 times"—which he held was "the 'pattern or practice' that Congress contemplated in enacting the adjustment provisions."

The "pattern or practice" provision was added to the Act by the Truth–in–Lending Simplification and Reform Act of 1980, Pub.L. No. 96–221, 94 Stat. 168, 171. As the Comptroller noted, the Senate Committee Report on the 1980 Legislation stated "that '[b]ecause most violations result from faulty procedures or misunderstanding of

the act's provisions and are therefore repetitive in nature, it is the committee's expectation that the 'pattern or practice of violations' criterion will encompass the majority of understatements committed by creditors.' S.Rep. No. 368, 96th Cong., 1st Sess. 26, *reprinted in* 1980 U.S.Code Cong. & Admin.News 262." The Comptroller properly concluded that the Bank's nondisclosure of the composite interest rate, which involved almost 700 violations over two years, was "the type of violations to which [the Act's] adjustment provisions are directed."

■ 2. The Act provides that except where the disclosure error resulted from a willful violation intended to mislead the borrower, the agency "need not require" an adjustment to debtors if it determines that the disclosure error "[r]esulted from any other unique circumstance involving clearly technical and nonsubstantive disclosure violations that do not adversely affect information provided to the consumer and that have not mislead or otherwise deceived the consumer." 15 U.S.C. § 1607(e)(2)(D). The Bank contends that its nondisclosure of the composite rate involved only "clearly technical and nonsubstantive disclosure violations" because the nondisclosure resulted from the Bank personnel's unfamiliarity with the Commentary requirements and did not adversely affect the borrowers or mislead or deceive them.

The Comptroller correctly rejected this contention. As he noted, the American Bankers Compliance Manual for the Act described the annual percentage rate as "among the most important disclosures required by TILA and Regulation Z." The Comptroller pointed out that "[w]ithout accurate disclosure of the APR, the borrower is unable to compare credit terms offered by other lenders, and a central purpose of TILA is defeated." The Bank's nondisclosure violations were neither "technical" nor "nonsubstantive" and they adversely affected the borrowers.

### III.

■ In 15 U.S.C. § 1607(e), the Act, after providing that the enforcing agency is

authorized to require a lender to make an adjustment to a borrower to whom an annual percentage rate or finance charge "was inaccurately disclosed," to assure that the borrower is not required to pay a finance charge in excess of that "actually disclosed," provides that, with exceptions not here applicable, "no adjustment shall be ordered"

> except in connection with violations arising from practices identified in the current examination and only in connection with transactions that are consummated after the date of the immediately preceding examination.

*Id.* at § 1607(e)(3)(i).

The "current examination," which identified the practices that gave rise to the violations found, was made as of June 30, 1988. The "immediately preceding examination" of the Bank was made as of December 31, 1987, and did not examine the Bank's compliance with the Act and Regulation Z. The last prior examination that considered those issues was made as of June 30, 1985.

The Comptroller held that in determining the reimbursement to the borrowers to whom the composite rate was not disclosed, the "immediately preceding examination" was the 1985 consumer compliance examination and that reimbursement therefor had to be made for the period January 1, 1985 to June 30, 1988. The Bank argues that the Comptroller's ruling rests upon a misinterpretation of the Act and that the proper period for determining the adjustment is from December 31, 1987, the date of the immediately preceding examination, to June 30, 1988.

We agree with the Bank.

"[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prods. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "The ordinary meaning of the words used are presumed to express congressional purpose; thus, ab-

sent clearly expressed legislative intention to the contrary, the language is regarded as conclusive." *State of Minnesota v. Heckler,* 718 F.2d 852, 860 (8th Cir.1983). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress'" *Board of Governors, FRS v. Dimension Financial Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685, 88 L.Ed.2d 691 (1986) (quoting *Chevron U.S.A. Inc. v. Natural Resource Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

■ We conclude that the statutory phrase "immediate preceding examination" is unambiguous and means exactly what it says. "[T]he legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Giving the words their ordinary meaning, the "immediately preceding examination" is the "examination" that was made just prior to the one in which the violations were discovered. In this case, the "immediately preceding examination" was the one made as of December 31, 1987, not the one made as of June 30, 1985.

Nothing in the statutory language even suggests that, when Congress used these clear and unambiguous words, it meant to refer to the immediately preceding examination of the same type, in this case a consumer compliance examination. If Congress had intended this effect, presumably it would have said so, by using some limiting language, such as inserting "consumer credit" between "preceding" and "examination", or inserting after the language it used "of the same type as that in which the violations were found."

In holding that "the phrase 'immediately preceding examination' refers to the last examination at which a consumer compliance review was conducted," the Comptroller pointed to nothing in the legislative history of this provision that justified his departure from its language. "Absent legislative history to the contrary, we must assume that the congressional purpose is expressed by the plain meaning of the statutory language and the language must be considered conclusive." *State of Arkansas v. Block,* 825 F.2d 1254, 1258 (8th Cir.1987).

The Comptroller's only explanation for his interpretation of the Act was that "[c]onstruing the TILA language literally overlooks the nature of the examination process and leads to results unintended by Congress." He stated that "[a]s the nature of banking and the laws applicable to it became more complex," the practice developed of conducting separate examinations for different aspects of a bank's operations, including consumer compliance, trust activities, and commercial operations, and that his office had made "specialized examinations and supervisory reviews" of different aspects of the Bank's activities. This rationale is insufficient to justify a departure from the unambiguous language Congress used. *See Dimension Financial Corp.,* 474 U.S. at 368, 106 S.Ct. at 685–86).

In his opinion, the Comptroller did not conclude that the language is ambiguous. In his brief before us, however, the Comptroller asserts that the language is ambiguous and that the legislative history of the 1980 amendments to the Act which added the "immediately preceding examination" language, supports his interpretation of those words. The Comptroller states that Senator Garn introduced the provision as an amendment during the Senate Banking Committee's markup of the Bill, *see* 125 Cong.Rec. S29913 (daily ed. October 29, 1979) (statement of Sen. Garn), and that "[i]n his explanation of the amendment, Senator Garn explained that its provisions were based upon those contained in a statement of interagency enforcement policy on Reg. Z issued by the Federal Financial Institutions Examination Council, ('FFIEC Reg Z. Enforcement Statement'). *Id.* at S29914. The Comptroller then states:

> The FFIEC Reg. Z. Enforcement Statement, referred to by Senator Garn, does not define the phrase "immediately preceding examination." But it describes the analogous phrase "current examination" as it is used in 15 U.S.C. § 1607(e)(3)(i) as the "most recent exami-

nation ... *in which compliance with Regulation Z was reviewed.*" 45 Fed. Reg. 48712 (1980) (emphasis added). Thus, it is reasonable to conclude that the FFIEC would have defined the phrase "immediately preceding examination" in the same manner, and, given the fact that 15 U.S.C. § 1607(e)(3)(i) was based on the FFIEC Reg. Z Enforcement Statement, that Congress intended the phrase "immediately preceding examination" to mean the "preceding examination in which compliance with Reg. Z was reviewed."

This attenuated and conjectural analysis, involving the different phrase "current examination," is a far cry from the "clearly expressed legislative intention", *Consumer Prods. Safety Comm'n*, 447 U.S. at 108, 100 S.Ct. at 2056, that is required before a court may depart from clear and unambiguous statutory language. It does not justify the Comptroller's interpretation of the Act.

### IV.

Since the Bank admitted that its failure to include the cost of private mortgage insurance in the finance charge was improper, the only remaining issue on this aspect of the case is whether the improper disclosure of the finance charge resulted from "a clear and consistent pattern or practice of violations." We find it unnecessary to reach that issue, however.

All of the instances of such nondisclosure occurred between March 26 and November 6, 1987. Since the Bank corrected those nondisclosures shortly after it discovered them, the sole question with respect to them is whether the Bank must reimburse the borrowers to whom it did not accurately disclose the finance charge. In view of our holding that the "immediately preceding examination" that was the starting date for reimbursement was the one conducted as of December 31, 1987, reimbursement necessarily cannot be required for these nondisclosures, all of which took place before that date.

### V.

In the portion of our opinion in *Sentinel* discussing Sentinel's contention that the Office of Thrift Supervision "exceeded its authority by ordering restitution.... based solely upon Sentinel's failure to comply with an Official Staff Commentary," we stated:

We are troubled by those portions of the OTS decision suggesting that the statute *requires* that restitution be ordered for this type of disclosure violation. Restitution is an equitable remedy. We have said before, and repeat again, that an agency must "fully articulate its findings and conclusions that justify such a remedy" for a TILA violation. *Citizens State Bank of Marshfield v. Federal Dep. Ins. Corp.*, 718 F.2d 1440, 1446 (8th Cir.1983).

946 F.2d at 90.

We found it unnecessary to decide those questions, however, because "Sentinel unequivocally stipulated to the restitution remedy" if Sentinel violated the Act or Regulation Z "in not disclosing a composite annual percentage rate." *Id.*

In the present case it is unclear from his opinion whether the Comptroller ordered restitution in the exercise of his discretion or because he believed he was required to do so upon finding violations of the Act or Regulation Z. The Act itself may be ambiguous with respect to his authority. Under 15 U.S.C. § 1607(e)(1), the enforcing agency, upon determining that "an annual percentage rate or finance charge was inaccurately disclosed ... is authorized ... to require the creditor to make an adjustment to the account of the persons to whom credit was extended." Section 1607(e)(2), however, states that each agency "shall require such an adjustment when it determines that such disclosure resulted from (A) a clear and consistent pattern or practice of violations." Subsection (e)(2) may reflect a Congressional intention that, although the general authority to make an adjustment is discretionary, adjustment is mandatory where there has been a pattern and practice. In this case, the Comptroller

found there was a pattern and practice, and we have upheld that finding.

On the remand we are ordering, the Comptroller, if he again orders reimbursement, should explain his reasons for doing so. If he believes that he is required to do so upon finding violations, he should point out the statutory or regulatory provisions that impose that requirement. If, however, he believes that he is exercising discretion in requiring reimbursement, he should explain the reasons for taking that action.

## VI.

The decision of the Comptroller is affirmed insofar as it determined that the Bank's failure to disclose the composite interest rate on its discounted variable interest rate consumer installment loans violated the Act and Regulation Z. The decision is vacated insofar as it directed the Bank to reimburse the borrowers of those loans for the period from January 31, 1965 to June 30, 1988, and the case is remanded to the Comptroller to consider whether to order reimbursement from December 31, 1987 to June 30, 1988 and, if he so orders, to explain his reasons for doing so. The decision is reversed insofar as it directed reimbursement for the real estate loans on which the disclosed finance charge did not include the cost of private mortgage insurance.