United States Court of Appeals,

Eleventh Circuit.

No. 95-4831.

CONSOLIDATED BANK, N.A., HIALEAH, FLORIDA n.k.a. Nationsbank of Florida, N.A., Petitioner,

v.

UNITED STATES DEPARTMENT of the TREASURY, OFFICE of the COMPTROLLER of the CURRENCY, Respondent.

Aug. 7, 1997.

On Petition for Review of a Decision and Order of the Comptroller of the Currency.

Before BARKETT, Circuit Judge, DYER, Senior Circuit Judge, and HARRIS[*], Senior District Judge.

HARRIS, Senior District Judge:

The petitioner, Consolidated Bank, N.A., Hialeah, Florida, n/k/a NationsBank of Florida ("Consolidated"), appeals a decision of the Comptroller of the Currency ruling that, for the purposes of calculating an adjustment under the Truth In Lending Act, 15 U.S.C. § 1607(e)(3)(i), the phrase "immediately preceding examination" signifies the immediately preceding examination in which compliance with the Truth In Lending Act ("TILA") was reviewed, rather than the temporally most recent examination of any type. We reject the Comptroller's interpretation of the statutory phrase, and reverse the Comptroller's decision.

I. Background

On March 9, 1994, the Office of the Comptroller of the Currency ("OCC") filed a Notice of Charges against Consolidated under the authority of TILA, as amended by the Truth in Lending Simplification and Reform Act of 1980, 15 U.S.C. § 1607(e)(4)(A), and pursuant to the procedures provided by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818 (1987). Consolidated was charged with violations of TILA and its implementing regulation, Regulation Z, 12 C.F.R. § 226. The charged violations included failure to include mortgage insurance premiums as finance

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

charges on residential mortgage loans, 12 C.F.R. § 226.18(d), and to disclose an accurate annual percentage rate on residential mortgage loans, 12 C.F.R. § 226.22(a). OCC requested that the administrative law judge ("ALJ") issue a final cease and desist order against Consolidated and an order requiring Consolidated to pay an adjustment totaling approximately $456,000.

Consolidated admitted the violations charged in the Notice, but challenged the OCC's adjustment calculation. Consolidated paid the undisputed portion of the adjustment, but refused to pay the disputed amount which was stipulated to be $143,517.21. Both parties filed motions for summary disposition on the sole remaining issue before the ALJ, *i.e.,* the legal interpretation of the statutory phrase "immediately preceding examination," 15 U.S.C. 1607(e)(3)(i), for the purpose of the adjustment calculation. Consolidated argued that the phrase refers to the immediately preceding examination, of any type, conducted of Consolidated by the OCC. The OCC contended that the phrase refers to the immediately preceding TILA compliance examination.

Three OCC examinations of Consolidated are of potential significance to the adjustment calculation. In 1991, the OCC conducted an examination of Consolidated for compliance with TILA and Regulation Z. No adjustment was ordered by the OCC as a result of that examination. In 1992, an examination was conducted addressing safety and soundness issues. No examination relating to TILA, Regulation Z, or consumer compliance was conducted at that time. In 1993, the OCC again examined the bank for TILA and Regulation Z compliance and reported that Consolidated had made inaccurate disclosures in violation of 12 C.F.R. §§ 226.18(d) and 226.22(a). As a result of that examination, the OCC sought an adjustment pursuant to 15 U.S.C. § 1607(e)(3)(i) and filed the March 9, 1994, Notice of Charges against Consolidated. Consolidated claimed in its motion for summary disposition that the relevant time period for the adjustment calculation was from the 1992 safety and soundness examination to the 1993 TILA examination; the OCC argued that the appropriate period was from the 1991 TILA examination to the 1993 TILA examination.

The ALJ concluded that Consolidated's motion should be granted and that the OCC's should be denied. On review, the Comptroller of the Currency rejected the ALJ's Recommended Decision and held that the phrase "immediately preceding examination" refers to the immediately preceding

TILA compliance examination, rather than the last examination of any kind conducted by the OCC. The Comptroller ordered Consolidated to pay the disputed amount of the adjustment to the affected customers.

II. Discussion

The sole issue on review is the proper interpretation of the phrase "immediately preceding examination" found in 15 U.S.C. § 1607(e)(3)(i). 15 U.S.C. § 1607(e) provides the guidelines by which the adjustment of finance charges resulting from disclosure errors by creditors is determined. Section 1607(e)(3)(i) states in part that no adjustment shall be required

> with respect to creditors that are subject to examination by the agencies referred to in paragraphs (1) through (3) of subsection (a) of this section, except in connection with violations arising from practices identified in the current examination and only in connection with transactions that are consummated after the date of the immediately preceding examination....

The parties dispute the interpretation of "immediately preceding examination." Consolidated contends that the plain language of the phrase means the most recent examination—of any type—prior to the current examination, and that this plain language meaning controls. Respondent asserts that the phrase is ambiguous and that we must, therefore, defer to the reasonable interpretation of the phrase by the enforcing agency.[1] The OCC interprets the phrase to mean only the immediately preceding TILA compliance examination.

Our initial step must be to determine whether Congress has spoken directly to the precise question at issue. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 257, 115 S.Ct. 810, 813, 130 L.Ed.2d 740(1995); *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The precise question is how the appropriate enforcement agency calculates and imposes an adjustment for a creditor's error in disclosing a financial charge or annual percentage rate. Section 1607(e)(which is titled: Adjustment of finance charges; procedures applicable; coverage criteria, etc.) carefully

---

[1]The Board of Governors of the Federal Reserve System ("Board") filed an amicus brief in support of the OCC. Since the Board's brief largely tracks that of respondent, we intend to address the Board's arguments, as well as those of respondent, when we refer to the OCC's arguments throughout this opinion.

details the procedures by which such adjustments should be calculated, the circumstances under which they should be imposed, and the scope of coverage. Section 1607(e)(3)(i) specifically limits a creditor's potential liability by restricting the time period on which an adjustment may be based to the period between the current examination in which errors are discovered and the "immediately preceding examination." We thus find that section 1607(e)(3)(i) does address the precise issue at hand by carefully explaining how an adjustment is to be calculated.

"[T]he starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). As a basic rule of statutory interpretation, we read the statute using the normal meanings of its words. *Gonzalez v. McNary,* 980 F.2d 1418, 1420 (11th Cir.1993); *Davis Bros., Inc. v. Donovan,* 700 F.2d 1368, 1370 (11th Cir.1983). " "Courts must assume that Congress intended the ordinary meaning of the words it used, and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive.' " *Gonzalez,* 980 F.2d at 1420 (internal citation omitted). We are required to look beyond the plain language of the statute only when the language of the statute is unclear or ambiguous, when Congress clearly has expressed an intent contrary to that suggested by the plain language, or when absurd results would ensue from adopting the plain language interpretation. *See Alacare Home Health Servs., Inc. v. Sullivan,* 891 F.2d 850, 856 (11th Cir.1990); *Hudgins v. City of Ashburn,* 890 F.2d 396, 405 (11th Cir.1989); *Blue Cross and Blue Shield of Ala. v. Weitz,* 913 F.2d 1544, 1548 (11th Cir.1990).

We agree with the Eighth Circuit's conclusion in an analogous case that the phrase "immediately preceding examination" is "unambiguous and means exactly what it says." *First Nat'l Bank of Council Bluffs, Iowa v. Office of the Comptroller of the Currency,* 956 F.2d 1456, 1463 (8th Cir.1992). In the absence of a statutory definition of a term, we look to the common usage of words for their meaning. "Examination" is defined as "[t]he act of examining or the state of being examined" or "[f]ormal interrogation." Am. Heritage Dict. 472 (2d college ed.1982). To examine means "[t]o inspect in detail," "[t]o observe or analyze carefully," "[t]o test the state or condition of," or "to interrogate or question formally." *Id.* Thus, the common definition of this term includes no

generically limiting language. Unless modified, the term examination refers to any sort of detailed or careful inspection, observation, interrogation, or questioning.

As Consolidated notes, the only language used to modify the term examination in the disputed phrase is temporal, not categorical. "Preceding," which directly modifies examination, means "com[ing] before in time." *Id.* at 974. "Immediately," which directly modifies "preceding," means "[w]ithout intermediary;  directly" or "[w]ithout delay". *Id.* at 643. Thus, according to common usage, the phrase at issue means the examination—of any sort—which occurred directly before the current examination. Respondent's interpretation would require us in effect to insert the words "TILA compliance" between Congress' chosen modifiers "immediately preceding" and the general term "examination" and to ignore the manifestly temporal nature of the existing statutory language.

There is absolutely no indication in the text that Congress intended any but the common meanings of these terms to apply. Had Congress wished unique or specialized meanings to attach to any of these terms, it readily could have taken the obvious and usual step either of including a specialized meaning in the definitions section of the statute or by using clear modifying language in the text of the statute.

The OCC suggests that its preferred Congressional intent may be inferred from the context of the phrase. It notes that "identical words used in different parts of the same act are intended to have the same meaning." *Department of Revenue of Or. v. ACF Indus., Inc.,* 510 U.S. 332, 333, 114 S.Ct. 843, 845, 127 L.Ed.2d 165 (1994). The OCC's argument that identical terms must be interpreted the same way is unpersuasive because the term at issue—"examination"—is not used identically throughout. For instance, the OCC supports its contextual argument by contending that a TILA examination clearly is being referred to in the following instances:

> with respect to creditors that are subject to *examination* by the agencies referred to in paragraphs (1) through (3) of subsection (a) of this section, except in connection with violations arising from practices identified in the current *examination* and only in connection with transactions that are consummated after the date of the immediately preceding examination, except that where practices giving rise to violations identified in earlier *examinations* have not been corrected, adjustments for those violations shall be required in connection with transactions consummated after the date of the *examination* in which such practices were first identified. [§ 1607(e)(3)(i)(emphasis added).]

with respect to creditors that are not subject to *examination* by such agencies, except in connection with transactions that are that are consummated after May 10, 1978. [§ 1607(e)(3)(ii)(emphasis added).]

A creditor shall not be subject to an order to make an adjustment, if within sixty days after discovering a disclosure error, whether pursuant to a final written *examination* report or through the creditor's own procedures, the creditor notifies the person concerned of the error and adjusts the account so as to assure that such person will not be required to pay a finance charge in excess of the finance charge actually disclosed or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower. [§ 1607(e)(6)(emphasis added).]

The OCC asserts that "examination" clearly refers to a TILA examination in every one of the above instances except, possibly, in the disputed phrase. However, we disagree. The OCC argues that the term examination must be read to mean TILA examination in the following two phrases from section 1607(i) and (ii): "with respect to creditors that are subject to examination by the agencies referred to in paragraphs (1) through (3) of subsection (a) of this section" and "with respect to creditors that are not subject to examination by such agencies." As noted above, the term examination itself is broad. The only modification of the term in the two cited phrases pertains to who performs the examination, rather than to what kind of examination is performed. As is noted by the OCC, many of these agencies perform more than one kind of examination, and the OCC provides no valid reason to assume that those other types of examinations are excluded.

We agree that the other underlined uses of the term "examination" have the narrower meaning asserted by the OCC. The immediately surrounding modifying language indicates the type of examination to which Congress is referring. In these instances, Congress makes clear the intended type of examination by directly linking the term examination to violations, practices, or disclosure errors giving rise to an adjustment under the TILA. However, Congress did not modify "immediately preceding examination" by any reference to violations found in that examination, or more explicitly, to a particular type of examination. Instead, Congress used only temporal modifying language. Congress' clear ability to modify the term "examination" to indicate the type thereof in the other instances noted by the OCC, and the fact that it did not do so in the disputed phrase, indicates that it had no intention to so limit the term. *Brown v. Gardner,* 513 U.S. 115, 120, 115 S.Ct. 552, 556, 130 L.Ed.2d 462 (1994) (" "[W]here Congress includes particular language in

one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ")(quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). Thus, the statutory language provides no evidence of contrary Congressional intent which would cause us to reject the ordinary meaning of the phrase "immediately preceding examination."

Having reached such a conclusion, we nonetheless consider the OCC's argument that the statute's legislative history provides evidence of such a contrary legislative intent. *Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980) ("[I]t would take a very clear expression in the legislative history of congressional intent to the contrary to justify the conclusion that the statute does not mean what it so plainly seems to say.").

In support of its proposition, the OCC relies on Senator Garn's introduction of section 1607(e)(3)(i) as an amendment to the TILA Simplification and Reform Act. That introduction indicated that the provision was based upon a proposed interagency enforcement policy statement on Regulation Z issued by the Federal Financial Institutions Examination Council (FFIEC). 125 Cong. Rec. S29913-14 (1979). The OCC concedes that the proposed policy statement referred to by Senator Garn does not define the phrase "immediately preceding examination."[2] It contends,

---

[2]The Federal Reserve Board notes that the proposed policy statement was an attempt to deal with TILA application and enforcement problems which had arisen from restitution guidelines adopted by the agencies in 1979. The problematic guidelines required reimbursement for all overcharges after October 1974, unlimited by any other time-based restriction or by linkage to an institution's history of compliance with the TILA. The proposed policy statement suggested limiting liability by requiring that the restitution period, in most instances, cover only the time between the "current examination" in which violations were discovered and the "immediately preceding examination." In support of this proposition, the FFIEC stated that "the agencies believe[d] that the Guidelines would operate more effectively if their retroactive application were tailored more precisely to the past performance of the institutions." 44 Fed.Reg. 60403. The Federal Reserve Board argues that this interest in linking performance to liability necessitates our importation of the phrase "TILA compliance" into the phrase "immediately proceeding examination." We disagree. In light of the comprehensive examination practices—in which several different types of examination might be performed simultaneously—in place at the time of this policy statement and of the enactment of the statutory language at issue, there is no reason to assume that Congress considered a TILA examination to be a separate and independent entity from other examinations conducted by the agencies. *See infra* pp. 13-14. The phrase "immediately preceding examination" often would have included TILA review in effect because of the existing examination procedures—thus furthering the asserted goal of tailoring liability to performance. Furthermore, the statutory phrase "immediately preceding examination" leaves the

however, that the final policy statement's treatment of the phrase "current examination" is a sufficient base from which to infer Congressional intent as to the meaning of the phrase "immediately preceding examination."[3] The OCC argues that because the final version of this policy statement defines "current examination" as the " "most recent examination ... in which compliance with Regulation Z [the implementing regulation for the TILA] was reviewed,' " 45 Fed.Reg. 48712 (1980), and because Senator Garn referred to the proposed policy statement in his introduction of the statutory provision, Congress expressed an intent contrary to that indicated by the plain language of the statute. The OCC urges that we reject the plain meaning of the statutory language in favor of its interpretation. We agree with the Eighth Circuit that "this attenuated and conjectural analysis, involving the different phrase "current examination,' is a far cry from the "clearly expressed legislative intention', *Consumer Prods. Safety Comm'n,* 447 U.S. at 108, 100 S.Ct. at 2056, that is required before a court may depart from the clear and unambiguous statutory language." *Council Bluffs,* 956 F.2d at 1464.

In a final attempt to overcome the strong presumption that Congress meant what its plain statutory language indicates, the OCC contends that the plain language interpretation of the provision produces absurd consequences and could not, therefore, reflect the intent of Congress. However, we find that any absurdity results not from the plain language interpretation of the statute, but rather flows from the OCC's overly narrow perspective of the provision's application and the changing background against which it has been applied. The OCC argues that reading "immediately preceding examination" to refer to any type of examination performed by the OCC would disrupt the enforcement of the statute and lead to its unequal application.

The OCC notes that in addition to TILA examinations, it performs safety and soundness,

---

decision of how to tailor liability within the discretion of the agencies which determine when and if to conduct TILA examinations. The plain language of the phrase simply introduces a temporal limitation on liability, the effect of which is entirely dependent upon the agencies' exercise of their discretion to determine what type of examinations they wish to conduct and when.

[3]We note that this final policy statement was not issued until after the enactment of the statutory language at issue. We also note that the proposed policy statement states only that a " "current examination' would be defined as an examination conducted subsequent to January 4, 1979, which was the effective date of the Guidelines." 44 Fed.Reg. 60404 (1979).

Community Reinvestment Act, trust, Bank Secrecy Act, fair lending, and electronic data processing examinations. If "immediately preceding examination" is interpreted to mean any type of examination, then instead of liability always being measured from TILA examination to TILA examination, TILA liability could be measured, for example, from a safety and soundness examination to a TILA examination. The OCC contends that such a result is absurd because it would arbitrarily cut off TILA liability and permit large banks which undergo frequent non-TILA examinations to escape potentially significant TILA liability.

The OCC focuses narrowly on its own examination procedures in advancing its argument that Congress could not have intended the plain language meaning of the disputed phrase because such a reading would cause absurd results. However, as the OCC acknowledges, multiple agencies are responsible for enforcing the TILA and have their own independent and different examination procedures. The OCC provides no reason to think that Congress specifically or primarily contemplated or focused on the examination methods of the OCC in drafting the TILA.

Furthermore, the OCC's examination procedures were evolving as late as 1991, eleven years after the phrase at issue was adopted. For instance, the OCC moved from a calender-driven "snapshot" approach, in which comprehensive examinations were given, to more specialized examinations six years after the disputed phrase was enacted. To argue that Congress could not have intended the plain language of the statute to apply because such an interpretation would create absurd results when applied against the background of administrative examination procedures that were implemented largely after the enactment of the disputed language is unpersuasive. Even if absurd results now were to result from the plain language interpretation of the provision as a consequence of evolving administrative practices, it is Congress' role to enact legislation to accommodate such changes, rather than our role to solve what the OCC sees as a statutory deficiency through judicial review.

We also disagree with the OCC's argument that the passage of time creates an arbitrary cutoff event for TILA liability which produces absurd results. First, Congress demonstrated its concern that a creditor not face limitless liability in terms of time by setting a one-year filing deadline from

the date of the occurrence of the violation for civil suits. *See* 15 U.S.C. § 1640(e). Second, as noted above, calender-driven, comprehensive examinations were being conducted by the OCC at the time the language at issue was adopted. If Congress considered existing agency practices at all in determining how to limit liability, time-based liability limits would have made sense considering the contemporaneous OCC calender-based examination procedures. Finally, as the ALJ noted, numerous agencies have enforcement powers under the TILA, and they follow different examination procedures and schedules. Accordingly, interpreting the disputed phrase as respondent urges, it would be possible that an institution which is examined by an agency that performs TILA examinations every year would face a maximum of a year of TILA liability, while an organization that is examined by an agency which performs TILA examinations every seven years would face a potential seven years of liability. Such a result surely would be no more logical than that produced by the plain language interpretation of the phrase at issue here. Accordingly, we cannot conclude that the plain language interpretation of the disputed phrase produces absurd results.

III. Conclusion

Thus, we hold that the plain language interpretation of the phrase "immediately preceding examination"—the most recent examination by the examining agency of any type prior to the current examination—controls. Therefore, we VACATE the decision of the Comptroller and REMAND the case to the agency for action consistent with this opinion.