UNITED STATES of America, Plaintiff,

v.

**The State of GEORGIA and Brian P. Kemp, Secretary of State of Georgia, in his official capacity, Defendants.**

**Civil Action No. 1:12–cv–2230–SCJ.**

United States District Court, N.D. Georgia, Atlanta Division.

April 30, 2013.

---

Abel Gomez, Janie Allison (Jaye) Sitton, Thomas Christian Herren, Jr., Thomas E. Perez, U.S. Department of Justice, Washington, DC, Sharon Douglas Stokes, Office of United States Attorney, Atlanta, GA, for Plaintiff.

Dennis Robert Dunn, Stefan Ernst Ritter, Office of State Attorney General, Julia B. Anderson, State of Georgia Law Department, Atlanta, GA, for Defendants.

### *ORDER*

STEVE C. JONES, District Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment [Doc. No. 24 and 25].

## I. Factual Background [1]

This case concerns the State of Georgia's runoff absentee voting scheme and

---

**1.** In accordance with the Local Rules of the Northern District of Georgia, both parties have submitted proposed statements of material facts and have had the opportunity to respond to the opposing party's submission. LR 56.1, NDGa. The Court has thoroughly reviewed all submissions, as well as the record. The Court resolves all objections and opposing responses to the statements of mate-

the federal laws that remedy the historical disenfranchisement of American citizens serving and living abroad who have been unable to vote because of logistical barriers. On June 27, 2012, the United States filed this action for declaratory and injunctive relief against the State of Georgia and its Secretary of State, Brian P. Kemp, in his official capacity, (collectively "Georgia" or "Defendants") to enforce the right of absent uniformed services voters and overseas voters to vote by absentee ballot in Georgia's general, special, primary, and runoff elections for federal office, which right is guaranteed by the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. §§ .1973ff *et seq.*, as amended by the Military and Overseas Voter Empowerment Act, Pub. L. No. 111–84, Subtitle H, §§ 575–589, 123 Stat. 2190, 2318–2335 (2009) ("MOVE Act").

The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1973ff–4 (authorizing the Attorney General to bring a UOCAVA enforcement action for declaratory or injunctive relief) and 28 U.S.C. §§ 1345 and 2201 (providing for original jurisdiction in the district court where the United States is a plaintiff and for jurisdiction over declaratory judgment actions).[2]

As this Order details, over the years, the State of Georgia has made great strides and demonstrated an honest and meritorious effort to comply with federal law and ensure that overseas voters can effectively exercise their right to vote. This is illustrated, for example, through Georgia's recent legislative enactments and technological enhancements of its voting resources. The United States and Georgia now dis-agree as to how federal law should be interpreted and applied to Georgia's efforts with regard to the timing and methodology of Georgia's runoff absentee voting scheme. Despite their differences of opinion, there is no doubt that both parties share the same fundamental, *and most important,* end goal of ensuring that overseas voters are able to effectively exercise their right to vote in United States elections.

UOCAVA specifically . guarantees uniformed services and overseas voters ("UOCAVA voters") the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 42 U.S.C. § 1973ff–1. In 2009, the MOVE Act amended UOCAVA to require that "[e]ach State shall ... transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter ... not later than 45 days before the election...." 42 U.S.C. § 1973ff–1(a)(8)(A).[3] The State of Georgia's respon-

---

rial facts through entry of the following factual background.

**2.** The Court agrees that said statutory provisions establish that jurisdiction is proper in this Court. The Court also recognizes that the issue set forth herein rests upon the contingency of future runoff elections being held in Georgia. The Court finds that there is a substantial likelihood of said contingency occurring; therefore, the present case is justiciable. *Browning–Ferris Indus. of Ala. Inc. v. Ala. Dept.of Envtl. Mgmt.,* 799 F.2d 1473, 1478 (11th Cir.1986) ("It is clear that in some instances a declaratory judgment is proper even though there are future contingencies

that will determine whether a controversy ever actually becomes real.... [T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists.").

**3.** This provision of the UOCAVA applies to all absentee ballot requests received by the state at least forty-five days prior to the election. For all requests received less than forty-five days prior to the election, the State must transmit the absentee ballot in accordance with state law and if practicable, "in a manner that expedites the transmission of such

sibilities under UOCAVA are set forth in 42 U.S.C. § 1973ff–1 and include ensuring that validly requested absentee ballots are transmitted in accordance with the provisions of UOCAVA. As Secretary of State, Brian Kemp is Georgia's chief election officer and is responsible for performing the duties imposed under Georgia's electoral laws. O.C.G.A. § 21–2–50(b).

Georgia was also a defendant in a 2004 action in which the United States alleged that UOCAVA voters from a substantial number of Georgia's 159 counties had not been mailed absentee ballots in time to receive and return them through United States postal mail for the July 20, 2004 federal primary election or the runoff on August 10, 2004. Compl. at pp. 4–5, *United States v. Georgia*, No. 1:04–CV–2040–CAP (N.D.Ga. July 13, 2004). In that case, on July 16, 2004, the Court entered a temporary restraining order and preliminary injunction, providing for several forms of relief. Thereafter, the Georgia General Assembly passed Act No. 53 (H.B. 244 of the 2005 Regular Session), which amended a number of sections of Georgia's Election Code. This Act, signed into law on April 22, 2005, included provisions designed to ensure long-term compliance with the UOCAVA by the State of Georgia and its counties [Doc. No. 2–3, p. 7]. The United States and Georgia also entered into a Memorandum of Understanding (containing various provisions and reporting requirements) ("the Memorandum") that was annexed to the stipulation and order of dismissal of the 2004 civil action [Doc. No. 25–8, pp. 7–13]. The Memorandum and the amended statutory law provided for the creation of a State Write-in Absentee Ballot ("SWAB") for federal and statewide offices [*Id.*].

The Memorandum's reporting requirements expired in 2008. As stated above, in 2009, Congress passed the MOVE Act, amending UOCAVA and requiring states to transmit absentee ballots to UOCAVA voters at least forty-five days before an election for federal office. 42 U.S.C. § 1973ff–1(a)(8)(A). In 2010 and 2012, Georgia's General Assembly passed legislation related to UOCAVA; however, Georgia has not passed legislation that provides for a forty-five day transmittal period for runoff election absentee ballots.

Under Georgia law, a runoff election is required when no candidate receives a majority of the votes cast in the initial election. O.C.G.A. § 21–2–501(a). A runoff election is held twenty-one days following a regular or special primary election (and twenty-eight days following a regular or special general election), including an election for federal office, in which a candidate failed to receive a majority of the votes cast. O.C.G.A. § 21–2–501(a). An official runoff absentee ballot is transmitted to a UOCAVA voter "as soon as possible prior to a runoff." O.C.G.A. § 21–2–384(a)(2).

UOCAVA requires a state to establish a written plan that provides for absentee ballots to be made available to UOCAVA voters in a manner that gives them sufficient time to vote in the runoff election. 42 U.S.C. § 1973ff–1(a)(9). The United States requested Georgia's plan after the March 6, 2012 Presidential Preference Primary [Doc. No. 8, p. 10]. Pursuant to the parties' agreement, Georgia provided said plan on April 20, 2012 [Doc. No. 17, p. 18].

A review of Georgia's written plan shows that Georgia has made provisions for both mail and electronic delivery of official absentee ballots [Doc. No. 24–8, pp. 3–4]. If a UOCAVA voter chooses to receive a ballot by mail, a SWAB is automatically included with each official absentee ballot." 42 U.S.C. § 1973ff–1(a)(8)(B).

ballot mailed to a UOCAVA voter for the initial election preceding the corresponding runoff election [*Id.*]. The mailing with the SWAB does not include a certified list of runoff candidates [*Id.*]. The mailing notifies UOCAVA voters that in the event of a runoff, they will be able to electronically access the appropriate ballot and instructions once the official ballots have been prepared and made available [Doc. No. 24–6, p. 2]. Georgia's written plan further provides that a UOCAVA voter may choose between a SWAB, a Federal Write-in Absentee Ballot ("FWAB"),[4] or the official absentee ballot, to vote in the federal runoff election [Doc. No. 24–8, p. 3]. In addition, Georgia allows a UOCAVA voter who submits a write-in ballot and later receives an official absentee ballot to also submit the official absentee ballot; however, the voter "should make every reasonable effort to inform the appropriate board of registrars that [he or she] has submitted more than one ballot" [*Id.* at p. 4]. Voted ballots may only be returned by mail [*Id.*].

Georgia's Secretary of State maintains a website that contains information for the UOCAVA voter [Doc. No. 24–2, p. 5, ¶¶ 15–16].

Georgia notes that its Secretary of State does not wait until the results of an election are certified, but posts the *unofficial* results of an election on his website within one day after the date of the election [Doc. No. 26–1, p. 19, ¶ 23].

Both parties agree that official election results are "generally" certified by the Secretary of State within a day after receipt of the certified results from the county election officials—said receipt must occur by 5 p.m. on the Monday following the election [Doc. No. 28–1, p. 12, ¶ 19]. O.C.G.A. § 21–2–493(k).[5]

Georgia law also provides that runoff absentee ballots from overseas voters must be postmarked by the date of the election and received within the three (3) day period following the runoff in order to be counted and included in certified election results. O.C.G.A. § 21–2–386(a)(1)(G).

On June 27, 2012, the United States filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction, asserting that emergency relief was necessary to remedy the imminent deprivation of the right to vote as guaranteed under UOCAVA because of Georgia's failure to ensure the transmission of absentee ballots to qualified UOCAVA voters at least forty-five days before the State's August 21, 2012 federal primary runoff election [Doc. No. 2]. At issue was whether Georgia's federal primary runoff scheme complies with the requirements of UOCAVA and if not, what remedial relief should be ordered to preserve the statutory rights of UOCAVA voters. The Court

---

4. As stated in Georgia's written plan: "On both the FWAB and SWAB, a voter may write in the name of a candidate or candidates for state offices that are elected on a statewide basis and for all federal offices in a runoff election. On the FWAB, the elector has the option of designating a candidate by writing in a party preference for each office, the names of specific candidates for each office, or the name of the person who the elector prefers for each office" [Doc. No. 24–8, p. 4]. There is no dispute that the FWAB is treated and processed by election officials in the same manner as the SWAB [Doc. No. 26–1, p. 17, ¶ 22].

5. In previous briefings by the parties, the Court was cited to a fourteen-day certification period under O.C.G.A. § 21–2–499(b); however, the parties now agree that the fourteen-day time line of § 21–2–499(b) does not apply to all federal elections and only applies to certain presidential elections for which there is no runoff [Doc. No. 28–1, p. 12]. Accordingly, § 21–2–499(b) is not relevant and has no application to the present case.

held a hearing on July 3, 2012 [Doc. No. 9].[6] After due consideration, the Court granted the United States' Motion for TRO/Preliminary Injunction and ordered remedial relief for the August 21, 2012 federal primary runoff election in the form of extended ballot receipt deadlines, mandatory website content, outgoing express ballot transmission, electronic and express ballot return, ballot counting procedures and notice, training of election officials, coordination with the Federal Voting Assistance Program, a press statement, and statistical reporting to the United States [Doc. No. 10].

After the August 21, 2012 federal primary runoff election and November 6, 2012 general election (for which a runoff was not necessary), the parties submitted a joint preliminary report and discovery plan, representing that "there presently are no genuine disputes as to any material facts" and proposing that the "Court consider their cross-motions for summary judgment prior to any discovery being conducted" [Doc. No. 20, p. 10]. The Court granted the proposed request and allowed each party to file and extensively brief their motions for summary judgment.[7]

Now before the Court are the parties' cross-motions for summary judgment.

## II. Legal Standard

As noted above, Plaintiff brings this action for declaratory and injunctive relief.

The Declaratory Judgment Act provides: "in a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such determination, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

■ Permanent injunctive relief may be awarded only upon a showing of: (1) irreparable harm; (2) an inadequacy of legal remedies to compensate for the harm; (3) a balance of the hardships in favor of an equitable remedy; and (4) an absence of disservice to the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S.Ct. 2743, 2756, 177 L.Ed.2d 461 (2010); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200 (11th Cir. 2008).[8]

---

**6.** In its summary judgment brief, the United States notes that Georgia has changed its arguments/position since the July 3, 2012 hearing. [Doc. No. 25–2, pp. 4–5]. For purposes of the present summary judgment analysis, the Court will only consider the arguments raised in the parties' summary judgment briefs. The Court will not incorporate the preliminary injunction positions/arguments into the present order.

**7.** The Court has also permitted and considered a surreply filed by Georgia [Doc. No. 30].

**8.** The Court notes that the Eleventh Circuit has applied a permanent injunction test that varies somewhat from the test applied by the Supreme Court in *Monsanto;* for instance, the test applied in *Thomas v. Bryant*, 614 F.3d 1288 (11th Cir.2010), calls for the plaintiff to establish success on the merits and does not

require a balancing of the harm. *Thomas*, 614 F.3d at 1317 ("To obtain a permanent injunction, a party must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if issued, the injunction would not be adverse to the public interest."). Here, as is apparent from the discussion below, the element of irreparable harm and the element of success on the merits are inextricably linked.

Georgia argues that to prevail at summary judgment on its claim for injunctive relief, the United States must establish each of the four elements necessary for a permanent injunction [Doc. No. 29, p. 1–2]. The United States contends that Federal Rule of Civil Procedure 56(a) provides the standard applicable at summary judgment, and, thus, to prevail at

Federal Rules of Civil Procedure 56(a) provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [9]

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997).

Here, the dispositive issue is a legal one, and each party seeks summary judgment in its favor based on its position regarding the applicability of the UOCAVA provisions at issue. The questions for the Court's consideration in the declaratory judgment context are whether 42 U.S.C. § 1973ff–1(a)(8)(A) applies to federal runoff elections and, if so, whether Georgia's election scheme for federal runoff elections complies with this section. If § 1973ff–1(a)(8)(A) does not apply to federal runoff elections, the Court must analyze whether Georgia's runoff election scheme complies with § 1973ff–1(a)(9). If, on the other hand, § 1973ff–1(a)(8)(A) does apply and Georgia's runoff elections scheme is non-compliant, the Court must determine whether the United States is entitled to summary judgment on its request for a permanent injunction, requiring Georgia to take all actions necessary to ensure compliance with the UOCAVA in future federal runoff elections. The United States would be entitled to summary judgment as to the permanent injunctive relief it seeks if the above-listed four elements are established.

summary judgment the movant must show that there are no genuine disputes of material facts and that the movant is entitled to judgment as a matter of law [Doc. No. 27, p. 4–5]. Because the United States seeks summary judgment on its claim for permanent injunctive relief, it must be shown that the United States is entitled to judgment as a matter of law based on undisputed facts, upon consideration of the permanent injunction factors. *See O'Connor v. Smith*, 427 Fed.Appx. 359, 367–68 (5th Cir.2011) (upholding grant of summary judgment where "[t]here was no genuine dispute of any material fact, and the plaintiffs were entitled to judgment as a matter of law because they established the necessary elements for a permanent injunction"); *H. v. Montgomery Cnty. Bd. of Educ.*, 784 F.Supp.2d 1247, 1268–69 (M.D.Ala.2011). Although the United States has not applied the permanent injunction standard in arguing for summary judgment in its favor and against Georgia, the record is sufficiently developed to inform the Court's consideration of each of the factors, and Georgia, the party to be enjoined, has had full opportunity to present its arguments under the standard.

9. On December 1, 2010, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. The amendments to Rule 56 "are intended to improve the procedures for presenting and deciding summary-judgment motions" and "are not intended to change the summary-judgment standard or burdens." *Farmers Ins. Exchange v. RNK, Inc.*, 632 F.3d 777, 782 n. 4 (1st Cir.2011) (internal quotation marks and emphasis omitted). "[B]ecause the summary judgment standard remains the same, the amendments 'will not affect continuing development of the decisional law construing and applying' the standard now articulated in Rule 56(a). Accordingly, while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule." *Murray v. Ingram*, No. 3:10–CV–348–MEF, 2011 WL 671604, *2 (M.D.Ala. Feb. 3, 2011) (internal quotation marks and citations omitted).

### III. Legal Analysis

#### a. Declaratory Judgment and Irreparable Harm Considerations

##### 1. Section 1973ff–1(a)(8)(A) Applies to Runoff Elections

As set forth in the analysis below, the Court finds that § 1973ff–1(a)(8)(A)'s forty-five day advanced mailing requirement for absentee ballots applies to federal runoff elections. Moreover, the United States has shown that Georgia's current runoff election scheme fails to comply with this requirement, as it does not provide for the timely transmittal of either the official absentee ballots or the SWAB along with a list of necessary candidate information to UOCAVA voters who wish to vote in federal runoff elections.

As noted above, UOCAVA requires each State to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter ... in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election ...." § 1973ff–1(a)(8)(A). Given Georgia's election schedule, the official absentee ballot will necessarily be transmitted less than forty-five days before a runoff election.[10]

Georgia argues that § 1973ff–1(a)(8)(A)'s forty-five day deadline does not apply to runoff elections. Georgia first contends that Congress's use of the term "an election" rather than the phrase "general, specific, primary, and runoff elections" signifies that Congress intended to refer to less than all of the types of possible federal elections in § 1973ff–1(a)(8)(A). Next, Georgia relies on § 1973ff–1(a)(9)'s requirement that "the States ... establish a written plan that provides absentee bal-

lots are made available to absent uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election." Georgia argues that while § 1973ff–1(a)(8)(A) does not specifically address runoff elections § 1973ff–1(a)(9) does. And, in specifically addressing runoff elections, § 1973ff–1(a)(9) requires that the states provide UOCAVA voters only "sufficient time" to vote in federal runoff elections. Georgia notes that it has a written plan in place for allowing UOCAVA voters sufficient time to vote.

 The plain meaning of the term "an election" supports the conclusion that § 1973ff–1(a)(8)(A) applies to runoff elections. The "starting point" of statutory interpretation is "the language of the statute itself," and the governing assumption is "that Congress used the words in a statute as they are commonly and ordinarily understood...." *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir.2010) (internal quotation marks omitted). The commonly understood meaning of the indefinite article "an" is "one" or "any." *See Black's Law Dictionary* (6th ed. 1990); *see also Lee v. Weisman* 505 U.S. 577, 615 n. 2, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J.) (noting that the First Amendment's prohibition against "**an** establishment of religion" evidences the intent to proscribe "**any** kind of establishment" of religion) (emphasis added). Thus, the term "an election" for federal office denotes any election for federal office, including a runoff election.

Moreover, this interpretation finds further support when the term is considered in "the entire statutory context." *Harri-*

---

10. The Court will address Georgia's arguments regarding use of the word "official," *infra.*

*son,* 593 F.3d at 1212 (internal quotation marks omitted). The first instance of the use of the word "election" in § 1973ff–1 is in reference to "general, special, primary, and runoff elections for Federal office." § 1973ff–1(a)(1). The second time that term is used, in § 1973ff–1(a)(2), it is preceded by the word "any." There is little doubt that the general reference to "any election" in § 1973ff–1(a)(2) is but a substitute for the specific reference to the four types of elections listed in § 1973ff–1(a)(1). Where Congress intended to refer to a specific type of election, it left no doubt of its intent. For example, § 1973ff–1(a)(3) expressly requires the states to permit UOCAVA voters to use FWABs in "general elections for Federal office."

To the extent there is doubt as to the breadth of the term "an election," it is settled by looking to the interplay between § 1973ff–1(a)(7) and § 1973ff–1(f). Section 1973ff–1(a)(7) addresses the transmittal of blank absentee ballots for "general, special, primary, and runoff elections for Federal office" and requires that transmittal procedures be established in accordance with § 1973ff–1(f). Notably, § 1973ff–1(f)'s transmittal procedures apply to "an election for Federal office." Thus, considering § 1973ff–1(f) together with § 1973ff–1(a)(7), it is apparent that the reference to "an election for Federal office" is applicable to any of the four types of elections listed in § 1973ff–1(a)(7).

The term "an election," used in § 1973ff–1(f) to signify any of the four types elections that are the subject of UOCOVA, is also present in § 1973ff–1(a)(8)(A). The meaning that attaches to the term in § 1973ff–1(f) also applies to the term in § 1973ff–1(a)(8)(A). This is so because the presumption is "that the same term has the same meaning when it occurs here and there in a single statute...." *Envtl. Def. v. Duke Energy Corp.,* 549 U.S. 561, 574, 127 S.Ct. 1423, 167 L.Ed.2d 295 (2007). The Court recognizes that this presumption should not be applied rigidly and that "[a] given term in the same statute may take on distinct characters from association with distinct statutory objects calling for different implementation strategies." *Id.* However, the conclusion that "an election" means any election out of the four possible types of elections recognized in § 1973ff–1 remains unaltered.

When considered in the context of § 1973ff–1 as a whole, a reference to "an election" in § 1973ff–1(a)(8)(A) has no further or different meaning than it has in § 1973ff–1(f). Section 1973ff–1 deals with four different types of elections, and a general reference within the section to an election, in the absence of language narrowing the focus of the term, is best construed as a reference to any of the four types of elections identified in the section. Both in § 1973ff–1(f) and in § 1973ff–1(a)(8)(A), the term is used in setting the parameters for the transmittal of absentee ballots. In the context of § 1973ff–1(f), the term pertains to the circumstance under which the states are obliged to transmit blank absentee ballots to UOCAVA voters—that is, § 1973ff–1(f) explains that the states are required to transmit absentee ballots to UOCAVA voters "for an election for Federal office." As used in § 1973ff–1(a)(8)(A), the term pertains to the time frame for the transmittal of absentee ballots—that is, § 1973ff–1(a)(8)(A) provides that where valid ballot requests are received ahead of time, the absentee ballots must be transmitted forty-five days before "an election for Federal office."

As noted above, the plain meaning of the term "an election" is "any election," and § 1973ff–1(a)(8)(A) itself contains no language limiting the application of the term "an election" to elections other than runoff

elections.[11] Georgia, however, argues that when read together with § 1973ff–1(a)(9) it is apparent that "an election" in § 1973ff–1(a)(8)(A) does not encompass federal run-off elections, as § 1973ff–1(a)(9) establishes an alternate standard for runoff elections, requiring the states to provide only "sufficient time" for UOCAVA voters to vote in runoff elections.

■ The "sufficient time" requirement in § 1973ff–1(a)(9) is not a carve-out from the forty-five day requirement in § 1973ff–1(a)(8)(A). First, there is no indication that the sufficient time referred to is a substitute for the forty-five day ballot transmittal requirement.[12] Second, § 1973ff–1(a)(9) can be reasonably read as establishing an additional requirement the states must comply with, that of establishing a written plan. Considering the logistical complexities of preparing for runoff elections, which are not held as a matter of course during every election season, the usefulness of a written plan, detailing in advance the practices to be implemented in the event a runoff election becomes necessary, is apparent. And there is no inherent conflict between the forty-five day provision of § 1973ff–1(a)(8)(A) and the written plan provision of § 1973ff–1(a)(9). It is possible for a state to comply with the requirements of both § 1973ff–1(a)(8)(A) and § 1973ff–1(a)(9) in the event a runoff election is declared. A state can transmit absentee ballots to UOCAVA voters forty-five days before a federal runoff election and have in place a written plan to ensure that its practices will provide UOCAVA voters sufficient time to vote. As such,

§ 1973ff–1(a)(8)(A) applies to federal run-off elections and § 1973ff–1(a)(9) merely establishes an additional requirement for runoff elections.

### 2. Georgia's Current Practices for the Transmittal of Ballots to UOCAVA Voters in the Event of a Runoff Election Do Not Comply With § 1973ff–1(a)(8)(A)

■ Georgia also argues that under the plain language of § 1973ff–1(a)(8)(A) its practice of automatically transmitting the SWAB with each official absentee ballot mailed forty-five days prior to the initial election (along with instructions for how to use the SWAB in the event of a runoff) and its treatment of the SWAB as an official absentee ballot in terms of casting and counting renders Georgia compliant with UOCAVA.

More specifically, Georgia argues that UOCAVA does not require it to transmit an official absentee ballot as it relates to the administration of runoff elections, and it notes that Congress included the word "official" in one section of the statute (when referring to the Federal Post Card Application in § 1976ff–1(a)(4)) but that it excluded it from the absentee ballot sections, i.e., §§ 1973ff–1(a)(8)(A) and (a)(9) [Doc. No. 24–1, pp. 16–17]. Georgia argues that when words are included in one section of a statute and excluded in another, it is presumed, per the rules of statutory construction, that the exclusion is intentional and purposeful [*Id.* (citing *United*

11. As also noted above, where Congress intended to make a reference to a specific type of election in § 1973ff–1, it did so by referring to the type of election it intended to address. *See* § 1973ff–1(a)(3) (addressing the use of the FWAB in general elections).

12. As noted below in Part III.a.2., UOCAVA does not define the term "sufficient time." For the reasons detailed in footnote 16 of this order, the Court accepts that "sufficient time" under UOCAVA means a forty-five day round trip period (from the transmittal of the absentee ballot to the UOCAVA voter to its return receipt by state election officials).

*States v. Alabama,* 691 F.3d 1269, 1289 (11th Cir.2012)) ].

Georgia is correct that UOCAVA does not specify that the "official" runoff absentee ballot has to be transmitted to the UOCAVA voter; however, it would seem to frustrate the purpose of UOCAVA for this Court to read the statute so narrowly as to conclude that the UOCAVA voter is not entitled to an official absentee ballot. It appears to this Court that even if UOCAVA does not specifically provide for an official ballot to be transmitted to the UOCAVA voter, the UOCAVA voter is, at the very least, entitled to a ballot that allows the voter to *effectively* exercise his or her right to vote in a runoff election, as well as to have the same information on his or her ballot that the voter who is stateside has.

Thus, the issue becomes whether a SWAB constitutes a sufficient absentee ballot so as to allow a UOCAVA voter to effectively exercise his or her right to vote.

Although UOCAVA does not explicitly discuss state write-in absentee ballots (*e.g.,* the SWAB), the statute does provide for the FWAB. 42 U.S.C. § 1973ff–2. While there are minor differences between the SWAB and the FWAB, they share one key and fundamental similarity: they are, by definition, write-in ballots that do not list the candidates for whom votes can be placed; instead, voters must obtain candidate lists from other sources and then write in the candidates' names on the

blank ballots.[18] *See, e.g.,* Doc. No. 24–4, p. 4; Dep't of Def. Fed. Voting Assistance Program, *Federal Write-in Absentee Ballot* (2012), *available at* http://www.fvap.gov/resources/media/fwab.pdf.

At least one court has found that the FWAB is a fail-safe that cannot substitute for timely transmission of an official state absentee ballot. *United States v. Cunningham,* No. 08–cv–709, 2009 WL 3350028, at *8 (E.D.Va. Oct. 15, 2009); *see also* 156 Cong. Rec. S4513, 4519 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer). The reasoning behind the holding in *Cunningham* applies with equal force to the SWAB. Among the FWAB's deficiencies discussed in *Cunningham,* the court focused on Congress's statement that the FWAB "is intended as an emergency back-up measure rather than as a replacement for the regular ballot" and "the fact that regular absentee ballots list all offices, names, party affiliations, and ballot propositions, while the [FWAB] is blank and requires voters to be able to make choices based on complete and advance knowledge of their jurisdiction's ballot." *Cunningham,* 2009 WL 3350028, at *8 (internal quotation marks omitted); *see also* 42 U.S.C. § 1973ff–2(a)(2)(A) (stating that the FWAB is merely a "back-up measure to vote in election for Federal office"). Like the FWAB, the SWAB is merely an emergency measure that is no substitute for Georgia's official absentee

---

**13.** At the preliminary injunction hearing and in its summary judgment briefs, Georgia distinguished the SWAB from the FWAB on the ground that the SWAB is transmitted by the state (without request from the UOCAVA voter and in advance of the runoff election)—by mail and electronically—along with instructions that direct the voter to access the additional candidate information on the Secretary of State's website, whereas the FWAB is not transmitted by Georgia and does not instruct a voter on how to obtain candidate information [Doc. Nos. 17, p. 28; 24–1, p. 19; and

26, p. 9]. These differences, however, are of no legal consequence. As correctly noted by the United States, in the absence of a certified candidate list being transmitted along with the SWAB, the SWAB does not provide sufficient information, standing alone, to cast an effective vote [Doc. No. 27, p. 15]. The SWAB also places a burden on the UOCAVA voter to seek out critical information, relies on the UOCAVA voter's ability to check a website, and ignores the situation of a voter who does not have regular internet access [*Id.*].

ballot for the runoff election. Indeed, the blank nature of the SWAB requires voters to have advance and separate knowledge of the runoff election in order to successfully fill out the SWAB and vote. Accordingly, the SWAB is merely a partial ballot that does not effectively allow the UOCAVA voter to exercise his or her right to vote in the absence of the necessary candidate information that is transmitted only weeks before the runoff. Accordingly, the Court finds that Georgia's transmission of the SWAB does not fulfill UOCAVA's forty-five deadline for transmitting a ballot.

The partial and deficient nature of the SWAB is readily apparent here. Georgia has two official methods for informing its overseas voters about runoff elections and the names of the runoff candidates: (1) listing the information on the Secretary of State's website, and (2) communicating the information through the official primary runoff absentee ballots, which are transmitted via the voters' preferred channels of communication [Doc. No. 2–2, p. 3]. *Cf.* 42 U.S.C. § 1973ff–1(f) (requiring states to transmit the ballots using the method requested by the voter, *i.e.* via mail or electronically). For those overseas voters who select mail delivery, there is a distinct possibility that they will be unable to vote in a runoff because they will not receive the candidate information until after the election. *See Cunningham,* 2009 WL 3350028, at *8 (finding that on average it takes seven to thirteen days to mail a

ballot to Iraq, "not including the time it takes to reach a servicemember in the field" and that in "some remote, austere locations, it may take as long as thirty-five days just for mail to [reach] that location ... before the servicemember can even open and read that mail, much less send response mail back to the United States") (internal quotation marks omitted). And even those voters who opted for electronic transmission would likely have to wait until a week after the election to learn of the *official* results from the Secretary of State's website [14] and use the SWAB— leaving fourteen days to vote and return the ballot by mail in a runoff following a regular or special primary election (and twenty one days to vote and return the ballot by mail in a runoff of a regular or special general election) rather than the minimum forty-five day round trip (*i.e.,* transmittal, voting, and return) period required by UOCAVA.[15] Thus, the SWAB is deficient, despite Georgia's measures for providing the necessary candidate information.

Georgia also argues that the SWAB, with its instructions, satisfies the standard in § 1973ff–1(a)(9) that requires the states to ensure that absentee ballots are made available to UOCAVA voters in a manner that gives them sufficient time to vote in the runoff election [Doc. No. 24–1, p. 20].

There is no definition of the phrase "sufficient time" in UOCAVA.[16] As stated

---

14. As previously noted, the parties agree that the Secretary of State generally certifies official election results within one day of receipt of the certified results from county election officials—said receipt must occur by 5 p.m. on the Monday following the election. O.C.G.A. § 21–2–493(k).

15. The Court acknowledges that Georgia law also provides that runoff absentee ballots from overseas voters must be postmarked by the date of the election and received within the three (3) day period following the runoff

in order to be counted and included in certified election results. O.C.G.A. § 21–2–386(a)(1)(G).

16. UOCAVA in silent as to the designation of an entity to approve a state's written runoff plan. In contrast, as it pertains to the hardship exemption provision of UOCAVA, Congress vested in the presidential designee the authority to approve a state's request for a waiver from compliance with § 1973ff–1(a)(8)(a)'s requirements. 42 U.S.C. § 1973ff–1(g)(2). Section 1973ff–1(g)(2) pro-

above, the Court finds that the "sufficient time" requirement in § 1973ff–1(a)(9) is not a carve-out from the forty-five day requirement in § 1973ff–1(a)(8)(A) as there is no indication that the sufficient time referred to is a substitute for the forty-five day ballot transmittal requirement.

Accordingly, the transmission of the SWAB (without the necessary candidate information that allows the UOCAVA voter to effectively exercise his or her right to vote) does not satisfy the standard in § 1973ff–1(a)(9) that requires the state to ensure that absentee ballots are made available to UOCAVA voters in a manner that gives them sufficient time to vote in the runoff election to the extent that "sufficient time" means a forty-five day transmittal period.

On the whole, under its current election scheme, Georgia is noncompliant with § 1973ff–1(a)(8)(A)'s forty-five day absentee ballot transmittal requirement as it applies to runoff elections: the candidates for a primary runoff election will be determined less than forty-five days before the runoff, and the transmittal of the SWAB alone fails to provide UOCAVA voters with the necessary candidate information to satisfy the purpose of UOCAVA.

Thus, considering the above, the Court finds that the United States is entitled to the declaratory judgment it seeks. The Court also find that the presence of irreparable harm, necessary for the entry of a permanent injunction. Irreparable harm occurs when a UOCAVA voter is denied the right to receive a sufficient absentee ballot in accordance with the provisions of § 1973ff–1(a)(8). The Supreme Court has consistently recognized that the right to vote is essential to the United States' form of government. *See, e.g., Bartlett v. Strickland,* 556 U.S. 1, 10, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) (holding that the right to vote is "fundamental"); *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (recognizing the right of voters "to cast their votes effectively," which "of course, rank[s] among our most precious freedoms"). The harm at issue in this case is a violation of UOCAVA's forty-five day deadline that protects the franchise of United States citizens overseas; the failure to comply with that deadline is an irreparable harm. *See United States v. Alabama,* 857 F.Supp.2d 1236, 1241–42 (M.D.Ala.2012); *see also Marchant v. N.Y. City Bd. of Elections,* 815 F.Supp.2d 568, 578 (E.D.N.Y.2011) (citing *Williams v. Salerno,* 792 F.2d 323, 326 (2d Cir.1986) (holding that an "infringement on the right to

vides that the presidential designee, after consultation with the Attorney General, must determine, among other things, that the plan put forward by the state provides UOCAVA voters sufficient time to receive and submit marked absentee ballots. No such provision is made for the approval of the written runoff plans submitted by the states. The Eleventh Circuit has held that "[w]hen a statute is ambiguous or silent on the pertinent issue, it ordinarily is for the judicial branch to construe the statute ... [b]ut the ordinary rule does not always apply" and "from that gap [in the statutory scheme left by Congress] springs executive discretion." *Gonzalez v. Reno,* 212 F.3d 1338, 1348–49 n. 11 (11th

Cir.2000). "As a matter of law, it is not for the courts, but for the executive agency charged with enforcing the statute ..., to choose how to fill such gaps." *Id.* Here, the United States Attorney General is charged with enforcing UOCAVA. 42 U.S.C. § 1973ff–4. The record shows that the Attorney General has utilized the guidance of the Federal Voting Assistance Program [Doc. No. 25–7] to conclude that a forty-five day time period applies to ballot transmittals to UOCAVA voters for runoff elections. To the extent the ordinary judicial construction rule may not apply, the Court accepts that this forty-five day policy determination is reasonable in light of UOCAVA's statutory scheme.

vote necessarily causes irreparable harm")).

### b. Remedies Available at Law Are Inadequate

Georgia does not contend that adequate legal remedies are available. It is apparent that the harm visited on UOCAVA voters by Georgia's current runoff election scheme is of a type for which only an equitable remedy, in the form of an injunction requiring Georgia to take steps to come in compliance with the UOCAVA, is best suited.

### c. Balance of the Harms Favors an Injunction

■ Georgia has identified two discrete classes of hardships it will face upon the imposition of an injunction. The first class is monetary capital. Without a doubt, Georgia would bear all of the monetary costs inherent in modifying its current runoff election scheme. However, placing an actual value on the monetary hardship would be a matter of speculation because Georgia has not specified its anticipated costs. The second class of hardship is human capital. It is claimed that, to ensure compliance with the injunction, overtaxed Georgia election officials would see an addition to their current work load and available resources would be overburdened.

■ The relevant question is whether the hardships that Georgia might experience are outweighed by the threatened injury to UOCAVA voters. "The right to vote is 'a fundamental political right.'" *United States v. Cunningham*, No. 3:08-cv–709, 2009 WL 3350028, at *4 (E.D.Va. Oct. 15, 2009) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). No right is more precious than the right to vote; even the most basic of other rights are illusory if the

right to vote is undermined. *Id.* (citing *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). "For our citizens overseas, voting by absentee ballot may be the only practical means to exercise [their right to vote]. For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion." *Id.* (quoting *Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F.Supp.2d 1305, 1307 (N.D.Fla.2000)). "Given that how and where our servicemembers conduct their lives is dictated by the government, their right to vote is 'their last vestige of expression and should be provided no matter what their location.'" *Id.* (quoting *Bush*, 123 F.Supp.2d at 1307). Indeed, Congress introduced the MOVE Act because our legislators were alarmed by the fact that active military members, their families, and thousands of other American citizens who were overseas could not cast a ballot while they served our country or lived overseas. 156 Cong. Rec. S4513, 4514 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer).

Here, the Court finds that the hardships that Georgia might experience are substantially outweighed by the threatened injury to UOCAVA voters. Contrary to Georgia's assertion that "[t]he interest of UOCAVA voters in their fundamental right to vote is not in question," [Doc. No. 24–1, p. 23], the absence of a requirement for the transmittal of a sufficient absentee ballot forty-five day prior to a runoff election in Georgia's current runoff absentee voting scheme does jeopardize UOCAVA voters' fundamental right to vote. The potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy.

Ultimately, Georgia's potential harm amounts to expenditures of time and money that will be incurred in performing

UOCAVA remedial tasks, as well as the inconvenience that Georgia election officials might experience. In weighing the threatened injury to UOCAVA voters against the hardships that Georgia might suffer if the requested injunction were granted, the Court finds that the potential deprivation of the ability to vote, the most basic of American citizens' rights, outweighs the cost and the inconvenience that might be suffered by Georgia as a result of its present runoff election scheme, which does not comply with the forty-five day transmittal requirements of UOCAVA. *See United States v. Alabama*, 857 F.Supp.2d 1236, 1242 (M.D.Ala.2012) (holding that the potential harm caused to UOCAVA voters far outweighed the burden placed upon the state because of the state's legally mandated obligation to provide UOCAVA voters the ability to vote).

#### d. No Disservice to the Public Interest

■ Finally, the requested permanent injunction will not be adverse to the public interest. The very nature of a statute such as UOCAVA evinces Congress's strong desire to protect the integrity of the democratic process. *See*, e.g.,156 Cong. Rec. S4513, 4514 (daily ed. May 27, 2010) (statement of Sen. Charles Schumer) ("Congress has a compelling interest to protect the voting rights of American citizens, and it is especially incumbent upon Congress to act when those very individuals who are sworn to defend that freedom are unable to exercise their right to vote."). Congress has recognized that the public is benefitted when voting rights are enforced. *See Torres v. Sachs*, 69 F.R.D. 343, 347 (S.D.N.Y.1975) (construing 42 U.S.C. § 1973*l*(e), voting rights enforcement proceedings). Indeed, "[n]othing is more critical to a vibrant democratic society than citizen participation in government through the act of voting. It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone." *United States v. New York*, No. 1:10–cv–1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012). Thus, there is no question that the requested permanent injunction, calling for Georgia to ensure that its federal runoff election scheme complies with UOCAVA, will not disserve the public interest.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 24] is hereby **DENIED**.

Plaintiff's Motion for Summary Judgment [Doc. No. 25] is hereby **GRANTED**. The Court declares the rights of the parties as follows. The forty-five day deadline and transmittal period established in the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), as amended, specifically 42 U.S.C. § 1973ff–1(a)(8)(A), applies to all federal runoff elections. The additional requirement for runoff elections set forth in § 1973ff–1(a)(9) does not alter the forty-five day deadline established for runoff elections in § 1973ff–1(a)(8). Defendants' inability under Georgia's current electoral system to transmit absentee ballots (that standing alone allow the voter to cast a meaningful vote) in future federal runoff elections to qualified military and overseas voters (*i.e.*, UOCAVA voters) who have requested them by the forty-fifth day before such an election violates § 1973ff–1(a)(8)(A) of UOCAVA.

As to the matter of relief, the Court rules as follows. Within **twenty days (20)** of the issuance of this order, Defendants shall confer with Plaintiff and thereafter submit to the Court written proposed changes to Georgia's election laws that

show full compliance with UOCAVA as to all future federal runoff elections. Plaintiff shall file a response **within twenty (20) days** of Defendants' filing. In the event that the Defendants fail to present a proposal that fully complies with all UOCAVA requirements, the Court will order an appropriate remedy that will govern all of Georgia's future runoff elections unless and until there is an enactment of changes to Georgia's election laws that fully comply with all UOCAVA requirements, as determined by this Court.