[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11298

_____

D.C. Docket No. 2:12-cv-00179-MHT-WC

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STATE OF ALABAMA,
SECRETARY, STATE OF ALABAMA,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(February 12, 2015)

Before MARCUS, JILL PRYOR and EBEL,[*] Circuit Judges.

MARCUS, Circuit Judge:

--------

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

In our nation's recent history, active military personnel and their families have faced severe difficulties exercising their fundamental right to vote. For affected service members, the decision to serve their country was the very act that frequently deprived them of a voice in selecting its government. Congress responded to this real problem by passing the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), a comprehensive series of requirements aimed at ending the widespread disenfranchisement of military voters stationed overseas. The statute includes a variety of measures that the states are required to adopt in order to accommodate military voters when they administer federal elections. By passing UOCAVA, and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing in the most basic of democratic rights.

Today, we are called upon to interpret a single provision in UOCAVA's general scheme. The parties in this case disagree about the meaning and scope of Title 52 U.S.C. § 20302(a)(8)(A)'s requirement that, when a qualifying military or overseas voter requests an absentee ballot for a federal election, a state must transmit a ballot to that voter forty-five days before the federal election. Neither this Court, nor any of our sister circuits, have opined on the scope of Congress's instruction. The United States commenced this suit against Alabama in the United

2

States District Court for the Middle District of Alabama, seeking to enjoin the State from holding federal <u>runoff</u> elections forty-two days after federal primary elections. The United States argued that the Alabama schedule violated UOCAVA's mandate and threatened to deprive military voters of the time they needed to receive and return their absentee ballots during runoff elections. The district court agreed, and after thorough review, we affirm.

The obligation that Congress has placed on the states is unambiguous: they must transmit absentee ballots to service members who validly request them forty-five days before "an election for Federal office." § 20302(a)(8)(A). Various other elements of § 20302(a)(8)(A) and of the surrounding sections of the statute confirm our understanding. As we explain in detail, Congress knew how to limit the scope of a provision so that it applied only during certain elections. Similarly, it knew how to create explicit exceptions to general rules, and indeed created an undue hardship exception to the forty-five day transmission timeline. § 20302(a)(8)(A), (g). But by choosing not to use these tools, which it otherwise wielded when drafting this statute, Congress gave us a clear indication that each state must comply with the forty-five day transmission requirement for any federal election, including a runoff election, for which it has not met the elements of undue hardship.

3

Alabama largely accepts these observations, but it urges us to hold that another UOCAVA provision, § 20302(a)(9), sets up an alternative rule for federal runoff elections. The State submits that § 20302(a)(9) directs the states to "establish a written plan that provides absentee ballots are made available to absent uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election." Id. (emphasis added). It urges us to read this language as allowing each state to determine how much time would be "sufficient" for its UOCAVA voters to return their ballots during runoff elections. We cannot agree. When we look to the text of § 20302(a)(9), we find that it directs states only to "establish a written plan" in preparation for runoff elections, and makes no claim that it abrogates the mandatory forty-five day transmission timeline. Id. (emphasis added). In light of the plain language of this substantive command -- and Congress's clear intent to prioritize the empowerment of military voters through clear and accessible absentee voting procedures -- we conclude that § 20302(a)(9) does not alter our interpretation. We, therefore, hold that the State must transmit validly requested absentee ballots to eligible UOCAVA voters forty-five days before each federal election, whether that election is primary, general, special, or runoff.

4

I.

A.

The Uniformed and Overseas Citizens Absentee Voting Act provides generally that states shall "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office" and "establish procedures for transmitting [absentee ballots] by mail and electronically" to these voters before "general, special, primary, and runoff elections for Federal office." [1] 52 U.S.C. § 20302(a)(1), (a)(7).  Beyond its baseline requirements, the statute also requires that states extend additional protections to the UOCAVA absentee voting process that they might not extend to other absentee voters as a matter of state law. See, e.g., § 20302(a)(2) (requiring that states accept all UOCAVA registration forms and ballot requests received at least thirty days before any election);

---

[1] UOCAVA defines "absent uniformed services voter" to include:  (1) "a member of a uniformed service on active duty who, by reason of such active duty, is absent from the place of residence where the member is otherwise qualified to vote"; (2) "a member of the merchant marine who, by reason of service in the merchant marine, is absent from the place of residence where the member is otherwise qualified to vote"; and (3) "a spouse or dependent of a [member of a uniformed service or the merchant marine] who, by reason of the active duty or service of the member, is absent from the place of residence where the spouse or dependent is otherwise qualified to vote."  52 U.S.C. § 20310(1).  It defines "overseas voter" to include:  (1) "an absent uniformed services voter who, by reason of active duty or service is absent from the United States on the date of the election involved"; (2) "a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States"; and (3) "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States."  § 20310(5).  For the sake of simplicity, we refer to these voters cumulatively as "UOCAVA voters."

§ 20302(a)(3) (requiring that states allow UOCAVA voters to use federal write-in ballots); § 20302(i) (prohibiting states from enforcing requirements regarding notarization, paper type, or envelope type).

At the heart of this case is one of these special protections afforded to UOCAVA voters.  Section 20302(a)(8) requires that states "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election."  In short, when a qualifying UOCAVA voter requests an absentee ballot from the state at least forty-five days before "an election for Federal office," the state is required to transmit a ballot to the voter forty-five days in advance of that election.  See id.

The text of § 20302(a)(8) also acknowledges that a later provision within UOCAVA enumerates circumstances in which the forty-five day transmission requirement does not apply.  Subsection (g), designated in the statute as the "[h]ardship exemption," provides that a state that submits a detailed proposal ninety days before a particular federal election may receive from the presidential designee[2] a waiver of the forty-five day transmission requirement for that election. § 20302(g).  A state's waiver application must explain the hardship preventing the

_____

[2] The President selected the Secretary of Defense as the UOCAVA presidential designee by Executive Order.  Exec. Order No. 12,642, 53 Fed. Reg. 21,975 (June 8, 1988), reprinted as amended in 52 U.S.C. § 20301.  The Secretary administers its responsibilities through The Federal Voting Assistance Program ("FVAP").  See Federal Voting Assistance Program (FVAP), 32 C.F.R. § 233 (2014).

state from complying with the forty-five day rule and propose a substitute timeline specifying how many days before the election UOCAVA voters will receive their ballots. § 20302(g)(1)(B)-(C). It must also articulate a "comprehensive plan to ensure that" UOCAVA voters receive and are able to submit their ballots in time for the state to count their votes. § 20302(g)(1)(D). The plan must detail "the steps the State will undertake to ensure that [UOCAVA] voters have time to receive, mark, and submit their ballots in time," and must include the state's rationale for asserting that its alternate plan will be an adequate substitute for the forty-five day timeline, including underlying factual information. Id. A state can obtain a waiver only if it has shown that it faces an "undue hardship" based on one of the following conditions: (1) "[t]he State's primary election date prohibits the State from complying"; (2) "[t]he State has suffered a delay in generating ballots due to a legal contest"; or (3) "[t]he State Constitution prohibits the State from complying." § 20302(g)(2)(B).

Also relevant to the resolution of this case are several requirements found within the statute that are directed at particular types of federal elections. By their very terms, they must be implemented only with respect to certain elections. Thus, for example, for general elections, UOCAVA directs the states to "permit [UOCAVA] voters to use Federal write-in absentee ballots," § 20302(a)(3), and "submit a report to the Election Assistance Commission" detailing the "combined

7

number of absentee ballots transmitted to [UOCAVA] voters for the election and the combined number of such ballots which were returned," § 20302(c). Of particular importance here is the requirement imposed exclusively on runoff elections. § 20302(a)(9). Subsection (a)(9) requires that "if the State declares or otherwise holds a runoff election for Federal office," it must "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them sufficient time to vote in the runoff election." Id.

## B.

The United States initiated this suit against Alabama[3] alleging that the State's primary election scheme was incompatible with its requirements under UOCAVA. Under Alabama law, runoff elections are required if no candidate in a primary election receives a majority of the votes. Ala. Code § 17-13-18. The dates are set by statute at forty-two days after the relevant primary election. See id. This system prevents Alabama from sending absentee ballots to UOCAVA voters forty-five days before runoff elections.

Alabama argues that it need not comply with the forty-five day rule in advance of federal runoff elections. According to the State, § 20302(a)(9) demonstrates that states need not transmit ballots forty-five days before runoff

---

[3] Shortly thereafter, the government filed a similar suit against the state of Georgia. See United States v. Georgia, 952 F. Supp. 2d 1318 (N.D. Ga. 2014), argued, No. 13-14065 (11th Cir. June 13, 2014).

elections. Alabama contends that the phrase "sufficient time to vote in the runoff election" creates an alternate timeline for runoff elections, allowing the State to decide how much time UOCAVA voters need to receive and submit their ballots. See id.

The district court disagreed and granted the federal government's motion for final summary judgment. United States v. Alabama, 998 F. Supp. 2d 1283 (M.D. Ala. 2014). The court based its decision primarily on the plain text of the two provisions at issue. First, it found that the forty-five day transmission requirement seemed by its plain language to apply during all federal elections for which a state did not secure an undue hardship waiver. Id. at 1288-89. Moreover, it observed that the terms of the written plan requirement did not expressly alter the requirements of § 20302(a)(8)(A). Id. at 1291. The court concluded that, rather than creating a discretionary exception to the forty-five day transmission requirement, "subsection (a)(9) merely reflects that Congress wisely saw the need to provide an additional remedy when it comes to runoffs: to require States to develop a written plan that would help to protect further against UOCAVA violations that will more likely occur under the time constraints of a runoff election." Id. at 1292.

The State timely appealed.

9

II.

We review a district court's grant of summary judgment de novo. Durr v. Shinseki, 638 F.3d 1342, 1346 (11th Cir. 2011). A district court may grant summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000) (quotation omitted). "In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.'" Id. (quoting Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir. 1997)). We also review questions of law, including statutory interpretation questions, de novo. Silva-Hernandez v. U.S. Bureau of Citizenship & Immigration Servs., 701 F.3d 356, 361 (11th Cir. 2012); Commodity Futures Trading Comm'n v. Levy, 541 F.3d 1102, 1110 (11th Cir. 2008).

A.

In conducting our analysis of § 20302(a)(8)(A), we find three elements of the statutory text to be particularly instructive. First, the plain language of the provision strongly suggests that it applies before any federal election. Second,

10

Congress's demonstrated ability to limit a provision, so that it applies only in a subset of elections, convinces us that it could easily have cabined the scope of the forty-five day transmission requirement if that were its intent.  Lastly, Congress's clear use of an express exemption within § 20302(a)(8)(A) tells us that, if it had sought to remove runoff elections from the provision's scope, it would have done so directly.  We discuss each in turn.

As "in any statutory construction case," we begin with the ordinary meaning of the text, Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013), and assume that Congress intended each word to have its ordinary meaning.  Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, 118 F.3d 1461, 1463 (11th Cir. 1997).  "Our 'inquiry ceases [in a statutory construction case] if the statutory language is unambiguous and the statutory scheme is coherent and consistent.'"  Cloer, 133 S. Ct. at 1895 (alteration in original) (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)).

Here, the directive of § 20302(a)(8)(A) is clear.  The forty-five day transmission provision mandates that states "transmit" absentee ballots to UOCAVA voters forty-five days before "an election for Federal office." § 20302(a)(8)(A).  The plain meaning of the term "an election" is "any election." In common terms, when "a" or "an" is followed by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either "any" or

11

"one." See Webster's Third New Int'l Dictionary 1 (2002) (explaining that the indefinite article means "any" or "each" when used with a restrictive modifier, and that it may be used to indicate one "example of (a named class)"); see also Black's Law Dictionary 1 (6th ed. 1990) (noting that the word "an" commonly means "one" or "any"). In this context, the more restrictive meaning of the indefinite article ("one") makes little sense: we presume Congress did not pass the statute in order to affect transmission of ballots to UOCAVA voters during one, unspecified election within the class of federal elections. See Consol. Bank, 118 F.3d at 1463-64 ("We are required to look beyond the plain language of the statute . . . when absurd results would ensue from adopting the plain language interpretation."). And in fact, Alabama concedes this point, writing that, if § 20302(a)(8)(A) is "all there is" on the subject of how long states have to send ballots to UOCAVA voters, then by its ordinary meaning, § 20302(a)(8)(A) "would govern federal runoff elections."

Notably, the phrase "an election" is followed by the qualifier "for Federal office." UOCAVA defines precisely which elections are elections for "Federal office" -- namely those elections for "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress." § 20310(3). Absent another statutory definition narrowing the term election, we read the phrase "an election for Federal office" to refer to all elections

12

for "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress" -- without distinction among primary, general, special, and runoff elections. See id. Similarly, the statute's most basic requirements apply broadly and without distinguishing between primary, general, special, or runoff elections. Thus, by example, § 20302(a)(1) provides that "[e]ach state shall . . . permit [UOCAVA] voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office," and § 20302(a)(7) requires that states "establish procedures for transmitting [absentee ballots] by mail and electronically" to UOCAVA voters before "general, special, primary, and runoff elections for Federal office." These provisions also suggest that a state's core UOCAVA obligations are in full force during each federal election, regardless of its posture in the election calendar. Thus, we read the forty-five day transmission requirement to be clear by its own terms.

Binding precedent from this Circuit affirms our approach to analyzing Congress's word choice. We have repeatedly found in prior cases that an indefinite article was purposefully used as a synonym for the word "any," determining that the context of a statute required us to read "a" or "an" to mean "any" rather than "one." Cmty. State Bank v. Strong, 651 F.3d 1241, 1256 (11th Cir. 2011) (observing that "the indefinite article 'a' suggests the court may

13

consider any possible suit"); Mixon v. One Newco, Inc., 863 F.2d 846, 850 (11th Cir. 1989) (holding that the legislature's use of the term "a period of seven years" as opposed to "the period" refers to any seven-year period, not the "seven-year period immediately preceding" (emphasis omitted)); Comm'r of Internal Revenue v. Kelley, 293 F.2d 904, 911-12 (5th Cir. 1961) ("The weakness in the Commissioner's argument is the assumption that there can be only one substantial part of a whole. . . . [The statute] requires only that 'a substantial part' be realized. The indefinite article 'a' says in plain language that there may be two or more substantial parts.");[4] see also Lee v. Weisman, 505 U.S. 577, 614 n.2 (1992) (Souter, J., concurring) ("[T]he indefinite article before the word 'establishment' [in the First Amendment] is better seen as evidence that the Clause forbids any kind of establishment . . . .").

We also find compelling in this analysis that Congress evinced the clear ability to circumscribe the scope of a provision when it chose to do so. In sharp contrast to § 20302(a)(8)(A)'s broad language, many of the surrounding provisions in UOCAVA are expressly limited. These provisions serve as persuasive evidence that Congress knew how to limit the scope of a provision to foreclose its operation during certain elections but chose not to do so when framing the forty-five day transmission requirement. As a general rule, we have explained that when

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

"Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely" in its exclusion.  CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1225-26 (11th Cir. 2001) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)); accord. Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1303 (11th Cir. 2008).  Because we find ample evidence in UOCAVA of "Congress' clear ability to modify the term" election "to indicate the type thereof," we conclude that its failure to include qualifying language in § 20302(a)(8)(A) "indicates that it had no intention to so limit the term" election in the forty-five day transmission requirement.  Cf. Consol. Bank, 118 F.3d at 1465.

Thus, Congress required that states allow UOCAVA voters to vote using "Federal write-in absentee ballots," but only in "general elections for Federal Office."  § 20302(a)(3) (emphasis added).  Similarly, Congress included a requirement that states report on the number of ballots sent to and returned by UOCAVA voters, and specified that the requirement applies only after "regularly scheduled general election[s] for Federal office."  § 20302(c) (emphasis added).  Finally, Congress decided that a state may obtain an undue hardship waiver if the state's primary election date prevents it from complying with the forty-five day transmission rule.  § 20302(g)(2)(B) (emphasis added).  These election-specific provisions each suggest that Congress knew how to limit the scope of a UOCAVA

15

requirement, and lead us to the conclusion that its decision to use broad and inclusive language in § 20302(a)(8)(A) was intentional.

One additional element of the text counsels our conclusion. As we see it, Congress demonstrated its ability to create specific exceptions to otherwise general prescriptions, but chose not to draft such a carve-out for runoff elections. Indeed, Congress explicitly designated one exemption to § 20302(a)(8)(A)'s mandate, providing that the requirement is in force "except as provided in subsection (g)." § 20302(a)(8)(A). If Congress also intended to create a runoff exception, we would have expected that it employ the tools at its disposal -- such as direct language or a cross reference -- to articulate this intent. However, § 20302(a)(8)(A) by its own terms acknowledges only one exception to its clear command. Specifically, it provides that states must comply with the forty-five day transmission requirement whenever they are administering "an election for Federal office" unless they meet the requirements set out "in subsection (g)." Id. Section 20302(g) in turn explains that, if a state can demonstrate that it would face "undue hardship" if forced to meet the forty-five day transmission deadline, § 20302(g)(2)(B), it may receive a waiver for that election and that election only, § 20302(g)(3)-(4). A state's ability to obtain a waiver, however, is expressly contingent on both a showing of hardship and a proposal detailing an alternate

16

timeline which still gives UOCAVA voters "sufficient time to vote as a substitute for the requirements" set out in § 20302(a)(8)(A).  § 20302(g)(1).

Thus, Congress has explicitly enumerated a discrete exception to a general rule, and we will not imply additional exceptions absent a clear direction to the contrary.  Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980); see also United States v. Brockamp, 519 U.S. 347, 352 (1997) (finding that attributes of the statute, including its "explicit listing of exceptions . . . indicate to us that Congress did not intend courts to read other unmentioned, open-ended . . .  exceptions into the statute that it wrote").  Indeed, in order for us to give the most natural meaning to Congress's direction that states transmit absentee ballots to UOCAVA voters "at least 45 days before an election for Federal office" "except as provided in subsection (g)," § 20302(a)(8)(A), we must conclude that "by explicitly including a . . . limited" hardship exemption, Congress "implicitly excluded" all other possible exceptions.  Cf. TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001).  Here, Congress easily could have worded the statute to require forty-five day ballot transmission "except as provided in subsections (a)(9) and (g)" if it had intended both clauses to constitute exceptions to the general rule.  "We are not, however, authorized to revise statutory provisions" under the pretense of interpreting them, and accordingly are unwilling to read in a runoff exception to § 20302(a)(8)(A).  In

17

re Hedrick, 524 F.3d 1175, 1187 (11th Cir.), amended on reh'g in part, 529 F.3d 1026 (11th Cir. 2008); accord. Pugliese, 550 F.3d at 1304.

As a final matter, despite the apparent clarity of § 20302(a)(8)(A), we remain mindful that "[s]tatutory construction is a 'holistic endeavor.'" Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004) (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988)).  The Supreme Court has instructed us to look to surrounding provisions when defining statutory terms, explaining that particular language is "often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning [more] clear." Timbers of Inwood Forest Assocs., 484 U.S. at 371.  Where Congress has used "identical words . . . in different parts of the same act," we presume that in each instance the phrase is "intended to have the same meaning." See Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (quoting Sorenson v. Sec'y of Treasury, 475 U.S. 851, 860 (1986)) (internal quotation marks omitted).  Thus, we pause to consider whether other uses of the phrase "an election for Federal office" within UOCAVA shed light on our inquiry.  Here, we need look no further than the other provisions defining the states' obligations to find a clear cross-reference confirming that Congress intended the phrase "an election for Federal office" to be afforded its plain and broad meaning.

18

Subsection 20302(a)(7) requires that states "establish procedures for transmitting by mail and electronically blank absentee ballots to [UOCAVA] voters with respect to general, special, primary, and runoff elections for Federal office," and directs that its mandate must be carried out "in accordance with subsection (f)." Each subsection within § 20302(f) elaborates on the specifics of § 20302(a)(7)'s general requirement, and thus, by virtue of the cross-reference, applies fully in "general, special, primary, and runoff elections for Federal office." See § 20302(a)(7). Importantly, § 20302(f)(1)(A) requires states to "establish procedures" to transmit by mail or electronic mail, depending on an individual voter's preference, "blank absentee ballots . . . to [UOCAVA] voters for an election for Federal office." Because § 20302(a)(7) already establishes that this subsection applies to "general, special, primary, and runoff elections for Federal office," there can be little question that "an election for federal office" as used in § 20302(f)(1)(A) encompasses all types of federal elections.

Quite simply, we find that both the content of § 20302(a)(8)(A) itself and inferences drawn from language found in surrounding UOCAVA provisions demonstrate that Congress intended the forty-five day transmission requirement to apply to any election for Federal office for which the state has not received an undue hardship waiver.

19

B.

Although we find the obligation in § 20302(a)(8)(A) to be unambiguous on its own terms, Alabama urges us to examine whether § 20302(a)(9) alters our analysis because it requires that, "if the State declares or otherwise holds a runoff election for Federal office, [the State shall] establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them sufficient time to vote in the runoff election." After careful consideration, we conclude that it does not. If we read this subsection in accordance with its ordinary meaning, we are compelled to find that it governs the states' establishment of a written plan, not the procedures or timing by which they transmit absentee ballots.

We begin with the language of the provision. Importantly, § 20302(a)(9) does not by its terms purport to (1) affect the substantive process by which states must transmit ballots, or (2) establish an exception to § 20302(a)(8)(A). Rather, this section sets out a simple requirement: states must establish a written plan detailing how they will transmit ballots in compliance with UOCAVA in the event of a runoff election. See § 20302(a)(9). Alabama can identify no language or cross-reference within § 20302(a)(9) suggesting it creates an exception to the forty-five day transmission requirement. Indeed, the differences in the actual commands in each sentence -- namely "transmit ballots" as opposed to "establish a plan" -- demonstrate that each provision places a different and specific requirement on the

20

states' administration of federal elections.  See Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co., 534 U.S. 327, 335-36 (2002) ("It is true that specific statutory language should control more general language when there is a conflict between the two.  Here, however, there is no conflict.  The specific controls but only within its self-described scope."); see also RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2071 (2012) (noting that "[t]he general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission" but that it may also be applied to avoid "the superfluity of a specific provision that is swallowed by the general one").

Additionally, nothing in either provision creates an inherent conflict with the other; states can easily comply with both requirements by sending ballots to qualifying UOCAVA voters forty-five days before all elections and also establishing a written plan describing procedures to be used in runoff elections.  While Alabama urges us to read § 20302(a)(9) as requiring states to transmit ballots in "sufficient time" for UOCAVA voters to cast their votes, we simply cannot draw that inference when the only active direction in the provision reads, "each state shall . . . establish a written plan."

Moreover, although Alabama argues that there is "no . . . reason to have a written plan concerning UOCAVA compliance specific to the runoff election," we

21

agree with the district courts that have considered this issue: Congress could reasonably have included § 20302(a)(9) within UOCAVA without any intention of altering the ballot transmission timeline for runoff elections. Georgia, 952 F. Supp. 2d at 1328; Alabama, 998 F. Supp. 2d at 1291-92. We have little trouble imagining that Congress believed the additional, preparatory step of writing a plan was necessary before runoff elections, given the unique "logistical complexities" that they entail. See Georgia, 952 F. Supp. 2d at 1328. After all, runoff elections are unscheduled, may occur infrequently, and arise on the heels of preparations for a substantially different election. Indeed, due to the condensed timeline and short notice that characterize runoff elections, it is entirely plausible that Congress created this extra requirement in hopes that states would be more likely to achieve compliance with UOCAVA's requirements if they prepared in advance.

Nevertheless, the State advances two arguments that merit discussion. First, Alabama contends that this Court should look to the waiver provision, § 20302(g), for the proposition that when Congress used the phrase "sufficient time to vote" within UOCAVA, it intended to designate a time period for transmitting ballots that is (1) set by the state and (2) less than forty-five days. Alabama also argues that, if we read § 20302(a)(9) to require only preparing a plan to comply with the forty-five day transmission requirement, we have rendered the term "sufficient time to vote" superfluous. We address each in turn.

22

First, Alabama notes that § 20302(g) allows states to obtain an exemption from the forty-five day transmission requirement by demonstrating to the federal government that the state's alternative plan ensures absentee voters receive ballots in "sufficient time to vote."  In other words, the phrase "sufficient time to vote," as it is used in the waiver provision, necessarily refers to a period of time that is less than forty-five days, because a state only needs a waiver of the forty-five day requirement when it seeks to implement a shorter timeline for transmitting ballots to UOCAVA voters.  Next, Alabama points out that the written plan provision uses similar language.  It requires that "if the state declares . . . a runoff election for Federal office" it must "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them sufficient time to vote in the runoff election."  § 20302(a)(9).  Therefore, the State submits, we should interpret the phrase, "sufficient time to vote in the runoff election" in § 20302(a)(9) to similarly entail a discretionary time period which the State may set at less than forty-five days.

We do not deny that Congress could have been more precise in its word choices.  Nevertheless, we find that essential differences between the waiver provision and the written plan provision foreclose Alabama's interpretation of § 20302(a)(9).  The hardship exemption provides that "[i]f the chief State election official determines that the State is unable to meet the requirement under

subsection (a)(8)(A)," the state may obtain a waiver of the requirement if it establishes "a comprehensive plan" for transmitting ballots to UOCAVA voters, § 20302(g)(1)(D), that includes "why the plan provides [UOCAVA] voters sufficient time to vote as a substitute for the requirements under such subsection," § 20302(g)(1)(D)(ii), and "the underlying factual information which explains how the plan provides such sufficient time to vote as a substitute for such requirements," § 20302(g)(1)(D)(iii).  Notably for our purposes, the waiver provision makes repeated reference to the fact that it serves as substitute for § 20302(a)(8)(A).  By contrast, the written plan provision makes no similar claim.

Moreover, by the express terms of the waiver provision, the state must show that its plan provides "sufficient time to vote as a substitute for [such] requirements."  See § 20302(g)(1)(D)(ii), (iii).  In other words, the substitute time and procedures that it proposes must themselves allow UOCAVA voters sufficient time to vote.  A runoff plan is different from a waiver plan in this respect.  A runoff plan must explain how a state will make ballots available to UOCAVA voters.  We draw this conclusion from the fact that the plan need not establish that voters have sufficient time to vote, but that "ballots are made available . . . in [a] manner that gives [voters] sufficient time to vote in the runoff election." § 20302(a)(9) (emphasis added); see also Webster's Third New Int'l Dictionary 1376 (2002) (defining "manner" to mean "the mode or method in which something

24

is done or happens," "a mode of procedure or way of acting," and "way, mode, fashion"). Other references within UOCAVA to the manner in which ballots are transmitted confirm that this phrase refers to the type of procedures used in, rather than the time required for, ballot transmission. See, e.g., § 20302(i) (providing that states may not "refuse to accept and process any otherwise valid voter registration application or absentee ballot application . . . or marked absentee ballot submitted in any manner by [a UOCAVA] voter" on the basis of notarization requirements, paper restrictions, or envelope restrictions); § 20302(a)(8)(B) (providing that when a state receives a request for a ballot less than forty-five days before an election it should transmit the ballot "in a manner that expedites the transmission of such absentee ballot").

We also observe that, although the phrase "sufficient time to vote" as it is used in § 20302(g) designates a period of less than forty-five days, the result is not simply that the states may choose whatever time period they believe to be suitable. Rather, states can only propose an alternate timeline, § 20302(g)(1)(C), that may be implemented only if approved by the Secretary of Defense, § 20302(g)(2). We have difficulty imagining that, having taken such care to establish a framework for federal approval of any ballot transmission of less than forty-five days under § 20302(g), Congress intended to implicitly exempt an entire class of elections from both compliance with the rule and all federal oversight simply because it used

25

the phrase "sufficient time to vote" in its requirement that states "establish a written plan" to guide their conduct during runoff elections.  See § 20302(a)(9).

Alabama's second argument -- that we ought not render the phrase "sufficient time to vote" in § 20302(a)(9) superfluous -- also requires serious discussion.  We recognize that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  TRW Inc., 534 U.S. at 31 (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)) (internal quotation marks omitted).  And when we engage in statutory interpretation, "[i]t is our duty to give effect, if possible, to every clause and word of a statute."  United States v. Menasche, 348 U.S. 528, 538-39 (1955) (internal quotation marks and citation omitted).  Here, Alabama argues that if states must in fact "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them" forty-five days to vote, this interpretation renders Congress's inclusion of the term "sufficient time to vote in the runoff election" a nullity.

We cannot agree.  As we have explained, the requirement in § 20302(a)(8)(A) is broad, but it is not absolute.  States need not transmit ballots forty-five days before an election if they apply for and are granted a waiver by the Secretary of Defense on the basis of undue hardship.  § 20302(g).  Congress could reasonably  have used the phrase "sufficient time to vote in a runoff election" in

§ 20302(a)(8) in recognition of the fact that, while most states will be transmitting ballots to qualified voters forty-five days before a runoff election, some states could be operating on a federally approved timeline pursuant to a hardship waiver.

Moreover, to the extent Alabama argues that a written plan for runoff elections is superfluous unless the timeline is also different -- because states must already have procedures in place that facilitate forty-five day transmittal -- we reiterate that Congress could reasonably disagree with Alabama's assessment.  As the district court explained, Congress could have determined that other elections are "logistically less demanding" than runoff elections, and accordingly imposed an additional requirement on the states to facilitate UOCAVA compliance during those elections.  Alabama, 998 F. Supp. 2d at 1292 (emphasis omitted).

This makes sense in light of the factual circumstances giving rise to the forty-five day requirement and other UOCAVA provisions.  Congress substantially changed the states' UOCAVA obligations in 2009 based on continued and pervasive disenfranchisement of eligible military and overseas voters.  See 156 Cong. Rec. S4513-02 (daily ed. May 27, 2010) (statement of Sen. Schumer) (explaining that Congress relied on data suggesting that "of those overseas voters who wanted to vote but were unable to do so . . . 34 percent [] could not vote because of problems in the registration process" and "39 percent [] who requested an absentee ballot in 2008 received it from local election officials in the second

half of October or later[,] much too late for a ballot to be voted and mailed back in time to be counted on election day"). Thus, it could reasonably have worried about the states' ability to comply with the new requirements during elections that can occur without notice and on an abbreviated timeline.[5]

In short, we find that Alabama's arguments, while carefully considered and not without some textual support, cannot overcome the plain text of §§ 20302(a)(8)(A) and (a)(9). By its plain language, § 20302(a)(8)(A) requires that states submit ballots to UOCAVA voters forty-five days before an election, and § 20302(a)(9) requires that they establish a written plan to facilitate UOCAVA compliance if they hold runoff elections. Absent a conflict between the two provisions or a clear direction that § 20302(a)(9) serves as an exception to the forty-five day transmission requirement, we are unwilling to adopt Alabama's interpretation of the written plan provision.

## C.

Because the text of § 20302(a)(8)(A) is clear, "we need not resort to legislative history." Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) (en banc); Merritt v. Dillard Paper Co., 120 F.3d 1181, 1185 (11th Cir. 1997) ("When

---

[5] Additionally, the record in this case reflects that, until the United States filed suit against it, Alabama had difficulty complying with the statutory requirements even during general and primary elections. Alabama, 998 F. Supp. 2d at 1292 ("Alabama concedes that it has failed to meet the 45-day requirement . . . in each of the last three federal elections."). The challenges of complying with UOCAVA even during regular elections support our conclusion that Congress could rationally have implemented extra protections during runoff elections.

28

the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)) (alteration in original) (internal quotation marks omitted).  However, we find that Congressional records confirm our interpretation in an important respect.  The parties have not cited, nor have we discovered, any intent on the part of Congress to carve out a runoff exception to the forty-five day transmission requirement, much less the "clearly expressed legislative intent to the contrary" that we would require in order to even consider overriding the plain language of the statutory provisions.  See Consol. Bank, N.A., 118 F.3d at 1463 (quoting Gonzalez v. McNary, 980 F.2d 1418, 1420 (11th Cir. 1993)).

Congress passed UOCAVA in 1986 in response to "the problem of involuntary absentee voter disenfranchisement" among military voters.  132 Cong. Rec. S7183-04 (daily ed. June 10, 1986) (statement of Sen. Warner); see also Uniformed and Overseas Citizens Absentee Voting Act of 1986, Pub. L. No. 99-410 § 102, 100 Stat. 924.  The House Report reflects that representatives were deeply concerned about the national failure to encourage military voting and ensure reliable processes allowing military votes to be counted.  When the report was published, the Federal Voting Assistance Program estimated that problems with absentee voting procedures had prevented some 400,000 citizens from voting

29

in the most recent federal election. H.R. Rep. No. 99-795, at 10 (1986), reprinted in 1986 U.S.C.C.A.N. 2009, 2014. In particular, the Report documents: (1) that many military personnel did not know how to obtain a ballot; (2) that a significant number of those who were able to attain a ballot did not receive clear instructions on how it should be filled out; and (3) that ballots often arrived at military posts too late for voters to fulfill state law absentee voting requirements and return the ballots in time for them to be counted. Id. at 8-10. When these problems persisted, Congress amended UOCAVA in 2009, passing the Military and Overseas Voter Empowerment Act ("MOVE Act"). Pub L. No. 111-84, §§ 575-89, 123 Stat. 2190, 2319-35. With the MOVE Act, Congress added more stringent protections on the absentee voting process, including the three subsections most salient to our analysis: the forty-five day requirement, the hardship waiver, and the written plan provision. Id. § 579. Because the 2009 amendments enacted each of the relevant provisions, we look to the history of the MOVE Act as the final piece of our analysis.

When examining legislative history, this Court has expressed a preference for Conference Reports, according weight to their "status as 'the final statement of terms agreed to by both houses.'" In re Burns, 887 F.2d 1541, 1549 (11th Cir. 1989) (quoting In re Timbers of Inwood Forest Assocs., Ltd., 793 F.2d 1380, 1399 n.33 (5th Cir. 1986), aff'd on reh'g, 808 F.2d 363 (5th Cir. 1987), aff'd sub nom.

30

Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365) (internal quotation marks omitted).  Here, the Conference Report is of little use to us, as it simply restates the forty-five day transmission rule and the written plan requirement in substantially the same language.  See H.R. Rep. No. 111-288, at 744 (2009) (Conf. Rep.).[6]  Notably, however, Congress did not use the Conference Report to include any language that would suggest that the requirement to establish a written plan should double as another exception to the forty-five day requirement.

Only one other piece of legislative history is available for the MOVE Act.  On May 8, 2010, Senator Charles Schumer read background and drafting history for the MOVE Act on the floor of the Senate, before asking for unanimous consent to print a section-by-section analysis of the Act into the Congressional Record.  156 Cong. Rec. S4513-02 (daily ed. May 27, 2010) (statement of Sen. Schumer).  Senator Schumer's statements in the record receive limited weight in our analysis,

---

[6] The Conference Report's commentary on the relevant sections of UOCAVA reads, in its entirety:

> The Senate amendment contained a provision (sec. 586) that would amend section 102 of the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) (42 U.S.C. 1973ff–1(a)(1)) to require States to transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter at least 45 days before an election for federal office unless the request is received less than 45 days before the election or a hardship exemption is approved by the Presidential designee responsible for federal functions under UOCAVA.  The provision also amends section 102(a) of UOCAVA to require States holding a runoff election for federal office to establish a written plan that would provide that absentee ballots are made available to absent uniformed services voters and overseas voters in a manner that gives them sufficient time to vote in the runoff election.

H.R. Rep. No. 111-288, at 744 (2009) (Conf. Rep.).

31

both because "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117 (1980) (quoting United States v. Price, 361 U.S. 304, 313 (1960)) (internal quotation marks omitted), and because "ordinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history," id. at 118.  We mention the Congressional Record only to point out that it makes no mention of the written plan requirement for runoff elections, much less characterizes it as a vehicle for exempting states from compliance with the forty-five day transmission requirement.

We also find it useful for one additional, albeit limited, purpose.  Alabama offered various policy arguments, both at oral argument and in its briefs, about the effect that complying with the forty-five day transmission requirement would have on voter turnout for runoff elections in the state.  Essentially Alabama argues that if states must push their runoff elections back seven weeks to accommodate UOCAVA's forty-five day transmission deadline, they will face significant voter attrition, not just for the relevant federal election, but also for any state election that requires a runoff.  This argument is based on the fact that Alabama, not surprisingly, holds state and federal elections on the same day to increase voter turnout.  The problem for Alabama is that this Court is not the proper forum in

32

which to raise these arguments.  "We cannot override what we view as a clear policy judgment by Congress."  In re Gurwitch, 794 F.2d 584, 586 (11th Cir. 1986).  "The role of this Court is to apply the statute as it is written -- even if we think some other approach might 'accor[d] with good policy.'"  Burrage v. United States, 134 S. Ct. 881, 892 (2014) (quoting Comm'r of Internal Revenue v. Lundy, 516 U.S. 235, 252 (1996)) (alteration in original) (quotation marks omitted). Here, Alabama has raised an important policy consideration and made a plausible showing that it might face a problematic decrease in voter turnout if it schedules its runoff elections seven weeks after its primary elections.  But when we look to the Conference Report and the Congressional Record, we can find no indication that Congress prioritized, or even considered, Alabama's concerns in its response to the problem of military disenfranchisement.

Ultimately, "[t]he very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable."  Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 513 (1982).  Alabama may well be correct in its calculations regarding lost votes from ordinary voters as compared to gained UOCAVA votes.  But Congress, not this Court, must be the branch of government to address these issues.

33

Accordingly, we AFFIRM the district court's grant of final summary judgment to the United States.

AFFIRMED.